STATE ex rel. THOMPSON, Relator, v. DISTRICT COURT et al., Respondents.

No. 8630

Submitted October 11, 1945. Decided November 20, 1945.

163 Pac. (2d) 640

Mr. Lester H. Loble and Mr. Albert Anderson, both of Helena, for relator.

Mr. Sherman W. Smith, of Helena, for respondents.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Relator seeks the supervisory powers of this court to annul an order of the respondent court dismissing his application for the appointment of a guardian of the person and estate of his mother, Lucile Y. Thompson.

The petition of relator in the respondent court was grounded upon allegations that because of the intemperate use of stimulants Lucile Y. Thompson is mentally incompetent to manage her property of which she is the owner of a substantial amount.

The evidence introduced at the hearing was substantially as follows:

Dr. John G. Thompson, of Helena, died in February, 1945, leaving surviving him his wife, Lucile, and his son, petitioner here, his only child. Petitioner was living in California with his wife and family at the time of his father's death. Upon learning of his father's death he came to Helena and remained here for a short time thereafter.

While in Helena he tried to persuade his mother, Lucile, to go to California with him. She at first agreed to do so and later changed her mind. Before leaving Helena for California petitioner made a complete list of the property of his mother, she not being able at that time to do so herself, she having stated to petitioner according to his testimony: "You take care of it; I don't know what it is all about." At that time she was taking seconal tablets and alcohol. She receives from insurance on an annuity basis the sum of $250 per month. She also owned between twelve and fifteen thousand dollars worth of bonds and there was considerable cash on deposit in the bank at the time of her husband's death, two automobiles and the home in which they lived; Mrs. Thompson also owned a

house and lot in Del Mar, California, which she inherited from her parents.

Petitioner after returning to California telephoned to his mother two or three times in an effort to persuade her to go to California but she said she wasn't able to travel and couldn't possibly make it. He finally received word that she was in the hospital at Helena with pneumonia and thereupon petitioner, his wife and Mr. John Young, a brother of Lucile Thompson, who lives in California, in the month of June following the death of Dr. Thompson came to Helena and found that Mrs. Thompson had returned to her home but that she was still very weak and quite ill. They again tried to persuade her to go to California to which she at first agreed and a day or two later changed her mind. When they first arrived in Helena she was glad to see them but by the time they left a few days later she didn't want to talk to any of the three.

A Mrs. Nash was staying with her some of the nights. She was formerly employed by the Thompson Clinic as a nurse. Mrs. Nash was then making collections for her and paying her bills.

Mrs. Thompson and Mrs. Nash each had a separate deposit box in the First National Bank of Helena. When petitioner arrived in Helena in May or June he found that his mother's jewelry worth about $15,000 was in the safety deposit box of Mrs. Nash. He obtained the jewelry from Mrs. Nash and returned it to his mother with the understanding that she would put it in her own box.

In September petitioner again returned to Helena. Mrs. Thompson was still very weak. She then seemed glad to see him. Petitioner then found that Mrs. Thompson had meanwhile cashed $5,000 of war bonds and made two withdrawals of $5,000 each from her bank account, one of which was made on July 19th and the other on July 27th.

He asked his mother about these withdrawals and found that she had no recollection of it but that if she had made the withdrawals the money must be in Mrs. Nash's safety deposit box.

Later Mrs. Thompson told petitioner that she thought this money "was collections from the doctor's accounts." She said she cashed the war bonds because "She was angry at one of the bankers" and did it to "spite him". Mrs. Thompson, according to the testimony of petitioner, called Mrs. Nash over the telephone and "told her she wanted to go down to the bank and get into the safety deposit box, Mrs. Nash"; that she informed Mrs. Nash that petitioner was there; that Mrs. Nash thereupon met Mrs. Thompson and petitioner at the bank and there was then removed from Mrs. Nash's box and placed in Mrs. Thompson's box $10,000 in cash, the proceeds of the withdrawals, consisting of $100 bills, all of the jewelry valued at $15,000 which had again found its way into Mrs. Nash's safety deposit box, and all the stocks and bonds belonging to Mrs. Thompson. Petitioner testified that Mrs. Thompson's explanation to him of the reasons for the withdrawals was that "she seemed to be afraid somebody was going to take it away from her. She said they put it down there for tax reasons. Then she mentioned the fact that most of it came from past collections from my father's past accounts." Petitioner testified that he had arranged to have Mrs. Nash collect the accounts on a 10% commission and that from his personal acquaintance with the accounts the $10,-000 was in no way involved in those accounts.

At the time that the property was removed from the safety deposit box of Mrs. Nash and returned to the box of Mrs. Thompson petitioner endeavored to persuade his mother to have the bank handle her affairs. She at first agreed to do so and an attorney was consulted to draw the necessary papers for her to sign the next day. During the course of the evening she changed her mind.

Petitioner testified that Mrs. Nash "seemed to have a great deal of influence on her." Mrs. Nash was told by petitioner of the plan to go to California and to have the bank look after his mother's property. Mrs. Nash planned to go to California with them. The next day Mrs. Thompson had changed her mind, saying that she "considered herself perfectly able to

handle her own affairs; that she didn't want to go to California; and that she wasn't going to be forced into anything.''

Mrs. Thompson has not yet looked after her inheritance tax. The opinion of petitioner is that Mrs. Thompson is not competent to handle her affairs and that there is great immediate danger of her losing practically all of her personal property. On cross-examination he was asked whether he would. sell the house if he were appointed guardian and he replied ''That is up to her.''

Petitioner was also asked: ''Q. She was frightened ever since your father died that if she went to California you would attempt to commit her to an asylum. Didn't she tell you that continuously? A. She didn't tell me that but she seems to have told everybody else that.'' He testified that the stocks and bonds that were in Mrs. Nash's box were not endorsed.

Regarding the house in California the record shows that Mrs. Thompson furnished it with new furniture at a cost of about $5,000 .and then sold the house completely furnished for $8,500 whereas according to petitioner the house alone was reasonably worth $12,000.

Mr. E. D. Patenaude, of Helena, engaged in the insurance and real estate business, testified that in 1942 he had examined the bills for the furnishing of the house in Del Mar, California; that in his estimation such furnishings were well worth $5,000; and that he insured them for that amount. He also testified that he had endeavored to sell the house for Mrs. Thompson, without the furnishings, for $12,000 but before any arrangement could be made she told him that she had arranged to sell the house through a California agent.

Mrs. Shidu testified that she had worked for the Thompson family off and on for thirty years. During the last few years she would come to clean the house three times a week. She testified that since February Mrs. Thompson spent much time in bed but lately she had been getting on her feet again. As to the pills she was taking, she described them as being in red capsules and that they had an ''awful effect'' on Mrs. Thomp-

son. She told of a time when she came there that she thought Mrs. Thompson was dying; that Mrs. Thompson couldn't talk. She also said that Mrs. Thompson's eating habits were very irregular.

Mrs. Shidu was asked about money matters and she testified that upon an occasion Mrs. Thompson sold a car for $500 and had the money in her purse. Mrs. Thompson asked the witness to change a $100 bill one night and the next night asked her to change another, having forgotten about the first request. The witness testified to the sale of other articles and to the question "What kind of condition was she in?" she answered, "She was in no condition to sell cars."

Dr. E. L. Gallivan, a witness for the alleged incompetent, testified that he had known the Thompson family for many years and during the latter part of Dr. Thompson's life he was associated with him. He told of the physical condition of Mrs. Thompson, which required his periodic attendance. He testified that her activity has been very much limited and that she hadn't been able to be active around the house or able to do her ordinary, routine housework at times. He stated that there was no evidence of phychosis. In answer to the question, "Doctor, from your knowledge as an expert plus anything else you know, would you tell us whether or not she is competent to handle her own affairs and her own physical being," he responded that "As far as my association with her is concerned, I can say she has never shown any evidence of being mentally disabled when I have seen her."

On cross-examination Dr. Gallivan testified that he went to her house at one time and couldn't get in except by breaking the glass door which he did, in company with the police, and found that Mrs. Thompson had fallen down the stairs and hurt herself so that she couldn't get up. He also testified that he prescribed the use of seconal tablets for her but whether she used them to excess he could not state. he testified that the excessive use of seconal and alcohol made a person "rum dumb." As to Mrs. Thompson's competency Dr. Gallivan testified: "The

only thing I can say is this, I have seen her when she was real sick, and seen her when she was in bed two or three times; I have seen her when she wasn't sick and I never have seen her when she wasn't clear and lucid and talked rationally to me.''

Mr. E. G. Toomey testified that he had known Mrs. Thompson since 1916 and that he had visited the home many times and recently and that he had always found her clear and lucid.

Mrs. John T. Ahern,' Mrs. Thompson's hairdresser, testified that in her relationship with Mrs. Thompson she seemed to be ''perfectly all right.''

Mr. Sherman Smith, Mrs. Thompson's attorney, testified that it was his opinion that ''she is perfectly able to handle her own affairs and take care of her own physical person.'' With regard to the safety deposit box, Mr. Smith testified as follows:

''The question came up as to her stocks and bonds in the First National Bank and Trust Company and she advised me she wanted Sally Nash to have the right to go into her box and asked me if I would ask the First National Bank and Trust Company to arrange it.

''I then suggested to Sally Nash that I didn't think it was a good idea because of these rumors around Helena for her to go into the box alone and she agreed with me.

''We thereupon again talked to Mrs. Thompson again and she suggested if I would go into the box with Sally it would be all right. I didn't particularly want to do this but agreed to do it and arranged for the bank to fix up an authorization for Sally and me to have the right to go into her box. However before we did do it I talked to Mr. Tenge and Mr. Brutsch about it and we discussed the rumors and everything. I suggested to them that I still didn't want to go in there with Sally alone as no ·inventory had been taken as far as I knew.

''I believe they then called Mr. Weir and Mr. Weir suggested that Dr. Gallivan go because he knew her mental condition, being her doctor. I then called Dr. Gallivan and arranged to have him meet us one Tuesday afternoon and the three of us went down into the vault.

"There were two boxes in the First National Bank and Trust Company and we made a complete inventory of all of the stocks and bonds which I saw, which inventory I have here and you can see if you want.

"I don't have any knowledge however of the transaction whenever it was whereby Mrs. Thompson cashed in her bonds or withdrew the $10,000.00 from the bank deposits. I don't even know just when that took place; I wasn't advised of that."

Mrs. Sally Nash testified that for many years she had been employed as a nurse in the clinic of which Dr. Thompson was a member and many times during the lifetime of Dr. Thompson she had taken care of Mrs. Thompson and that after Dr. Thompson's death she had the "biggest" part of Mrs. Thompson's care. As to Mrs. Thompson's habits, she testified that Mrs. Thompson took an occasional drink and that she took, under the doctor's orders, a tablet of aminophylline every other day and "seconal when necessary."

She testified that since February 1945 Mrs. Thompson had paid her $125. As to the jewelry being found in the safety deposit box, she testified that while Mrs. Thompson was in the hospital she asked Mrs. Nash to go to the house, which was unoccupied, and get the jewelry and put it in her (Mrs. Nash's) box. There is no explanation as to how the jewelry got into Mrs. Nash's box the second time.

As to the cashing of the war bonds, Mrs. Nash testified as follows:

"Q. How was this withdrawal or cashing in of $5,000.00 in war bonds made? A. We went to the bank together one day and she drew out her bonds. Then she sent me to the bank and I went to Mr. West and gave them to him and he deposited the money to her account.

Regarding the first withdrawal of $5,000 Mrs. Nash testified:

"Q. How was the first withdrawal of $5,000.00 by check made? A. She was with me. We drew it out and put it in the box.

"Q. Why did you put it in your box? Why did you both

put it in your box? A. We put it in my box because we were going to take this trip. I was doing something else and I wanted her to take care of her affairs but she wasn't able to come down because her legs were swelling at the time and if she did go I would say they were swollen so she could hardly get her shoes on.''

As to the second $5,000 in cash, Mrs. Nash testified as follows:

''Q. Now about the second $5,000.00 withdrawal; Tell us about that. A. She made check I think it was about a week or ten days later than the first one. I went to the bank, drew out that money, $5,000.00 in $100.00-bills, and put it in my box.

''Q. She wasn't with you at all? A. She wasn't able to come.

''Q. Were you able to get into her box alone? A. No. That was the reason she had me put it in my box.

''Q. You couldn't have deposited it in her box if you had wanted to? A. I tried and the bank said they weren't able to let me in anyway.

''Q. Was there any time Lucile Y. Thompson didn't know this $10,000.00 cash and the jewelry were in your box? A. No. She knew all of the time.

''Q. She knew all of the time didn't she? A. Yes.

''Q. What was the occasion for withdrawing the second $5,000.00? Why did she want to withdraw it? A. She wanted $10,000.00 to take in traveller's checks to pay for that trip.

''Q. Did you say anything about that, about $10,000.00 being too much? A. Yes I did.

''Q. What was the conversation? A. I said: 'That is too much to take. Why don't you leave it in the bank and when you get wherever we are going transfer it to a checking account there? I think that is too much to take and besides I have had trouble cashing traveller's checks even where I was known.''

''Q. She overruled you? A. She did.''

On cross-examination Mrs. Nash explained as follows:

''Q. I am talking about the first $5,000.00 you and she took and put in there. A. Yes but she didn't want to.

''Q. In other words when you got down there with the first

$5,000.00 in cash that was withdrawn it was just a question of whether you asked the girl down there to open her safety deposit box or yours and that is all. A. No, it wasn't. She didn't know whether she would be able to get down again if her legs swelled. That is why I put it in mine 'stead of hers, so I could get it.

"Q. You could just as well have put the $5,000.00 in her safety deposit box as yours? A. I imagine, yes.

"Q. You were in the same bank and had your safety deposit box in the same bank? A. That is true. But one time she went down there and before she could get into her own box they came down and looked to see if she was competent. That is what irritated her. There was so much talk about her being incompetent they came down and looked her over before they would let her in her own box."

The question before us is, Did the court err in refusing to appoint a guardian of the person and estate of Lucile Y. Thompson?

Our statute empowers the court "after a full hearing" to ▮ appoint a guardian of the person and estate if it appears to the court or judge that the person in question is "incapable of taking care of himself and managing his property." Sec. 10413, Revised Codes. In order to warrant the appointment of a guardian for an adult it is not essential that it be shown that such adult is insane in the technical sense; the test to be applied is whether there is such mental impairment as renders the subject incapable of understanding and acting in the ordinary affairs of life. 25 Am. Jur., Guardians & Wards, pp. 18, 19.

"On the other hand, it has been held in a number of cases ▮ that a guardian cannot be appointed merely because a person does not or cannot manage his property judiciously, or, in other words, because he is not capable of managing his estate as well as such estates are commonly managed. Nor does susceptibility to influence justify the appointment of a guardian, if the alleged incompetent possesses capacity to manage his property as a result of sanative reasoning, although a contrary rule prevails if, in the disposition of his property he is guided by

the will of others, rather than by his own. The unsoundness of mind which will justify an appointment must be more than mere debility or impairment of memory, or a mere possibility that the subject will become insane in the future." 25 Am. Jur., p. 19, sec. 18. To the same effect is 44 C. J. S., Insane Persons, sec. 11.

Subjecting the evidence in the record to this test, what do we find? There is evidence that when Mrs. Thompson was first approached regarding the two withdrawals she had no recollection regarding them. The evidence raises considerable doubt whether Mrs. Nash was imposing her will upon Mrs. Thompson in regard to her property. The explanation of Mrs. Nash that the money was to be used to purchase traveler's checks was unsatisfactory to say the least. We recognize the rule that a person may do as he pleases with his own property and that right should not be taken away or withheld except for cogent reasons. However, the evidence, both direct and circumstantial, raises sufficient doubt in our minds as to whether Mrs. Thompson is capable of looking after and managing her property so as to require an examination of the alleged incompetent. Mrs. Thompson was in the courtroom during at least a part of the hearing but did not testify. The statute requiring her production in court would seem to contemplate her examination. Matter of Coburn, 165 Cal. 202, 131 Pac. 352. In re Waite's Guardianship, 14 Cal. (2d) 727, 97 Pac. (2d) 238. We think justice requires and we order the case remanded to the trial court with directions to rehear the matter and, at the new hearing, an examination of Mrs. Thompson shall be had along with such other evidence as either party desires to submit.

Mr. Chief Justice Johnson and Associate Justices Morris, Adair and Cheadle concur.

JUDSON, ADMINISTRATOR, Respondent, *v.* ANDERSON,
Appellant.

No. 8578

Submitted August 23, 1945. Decided November 20, 1945.

165 Pac. (2d) 198

Messrs. Hall & Alexander, of Great Falls, Mr. Lloyd A. Murrills, of Cut Bank, and Mr. Lester H. Loble, of Helena, for appellant.

Mr. John J. Greene, of Cut Bank, and Mr. Wellington D. Rankin and Mr. Arthur P. Acher, both of Helena, and Mr. Louis P. Donovan, of Shelby, for respondent.

MR. JUSTICE CHEADLE delivered the opinion of the court.

Peter B. Anderson, the original plaintiff herein, died subsequent to perfection of the appeal, and the present plaintiff was substituted by order of this court. In the following opinion the said Peter B. Anderson will be referred to as the plaintiff.

Appeal from a judgment granting plaintiff a decree of divorce, denying defendant relief on her cross-complaint for separate maintenance, and ordering the defendant to vacate plaintiff's home.

The complaint is based upon extreme cruelty, and in addition to alleging the infliction of grievous mental suffering in the language of section 5738, Revised Codes 1935, the complaint contains the following allegations of items of cruelty, which the trial court embodied practically verbatim in its findings of fact:

1. That defendant for more than two years last past has perpetually nagged, fumed and scolded at the plaintiff and treated him in an abusive and scornful manner.

2. That defendant repeatedly called plaintiff "a big liar," which gave rise to quarrels in the home and thus disturbed his peace of mind and happiness.

3. That ever since the spring of 1941 the defendant has refused to sleep with the plaintiff and persists in sleeping apart from him against his will and wishes.

4. That plaintiff's former wife is deceased and there were several children the issue of his former marriage; that ever since the marriage of the parties hereto the defendant has continually run down and made slanderous remarks against his said children and has refused to make them welcome visitors in his

home, all of which has caused plaintiff great mental suffering.

5. That defendant's tirades against his said children are made maliciously and with the intent on the part of the defendant to hurt the feelings of plaintiff and to vex and annoy him.

6. That defendant maliciously accused the plaintiff of unchastity and marital infidelity, all of which was and is wholly false and untrue and without any foundation in fact whatsoever, and same caused plaintiff great anguish of mind and grievous mental suffering.

7. That for more than two years immediately preceding the commencement of the action the defendant has been guilty of extreme cruelty of and toward plaintiff by the infliction of grievous mental suffering upon plaintiff.

Simultaneously with the signing of the judgment the trial court rendered the following memorandum opinion, which was made a part of the record:

"It is my opinion, and I desire it to be made a matter of record in the case, that the defendant did not in any respect fulfill her duties to the plaintiff as a wife and that this course of conduct on her part commenced very shortly after the marriage between them. While the plaintiff is no longer a young man he was at least entitled to the consortium of his wife. To me, her excuse for locking her bedroom door against the plaintiff at night was utterly ridiculous and I feel the testimony justified the inference that she avoided the attentions of her husband and that her principal interest in the marriage was based upon the financial considerations which she thought would flow therefrom.

"I think the plaintiff's allegations of cruel and inhuman treatment are fully substantiated by the evidence.

"It is my view that, under the decisions of our supreme court, when a decree of divorce is entered against a wife, that she is not entitled to permanent alimony."

All but two of thirteen specifications of error are directed at the findings and conclusions of the trial court. The other two assign error in rendering the memorandum opinion above quoted,

and permitting plaintiff to answer a question which we shall allude to later.

The sole question presented on this appeal is that of the sufficiency of the evidence to support the decree and judgment. The answer to this depends upon whether or not the evidence substantially established the infliction of extreme cruelty by the defendant upon the plaintiff, as contemplated by statute and as alleged in the complaint. At the outset we affirm and reiterate the rule that in cases of this nature the findings of the trial court will not be disturbed by this court where the record contains substantial evidence upon which they may be sustained; that when the evidence furnishes a substantial basis for the findings they will be permitted to stand. Such rule is so firmly established and of such universal acceptance as to require no citation of authority.

Section 5738, Revised Codes 1935, defines extreme cruelty, so far as here applicable, as "* * * the infliction of grievous mental suffering upon the other by one party to the marriage, by a course of conduct towards or treatment of one party to the marriage by the other, existing and persisted in for a period of one (1) year before the commencement of the action for divorce, which justly and reasonably is of such a nature and character as so to destroy the peace of mind and happiness of the injured party, or entirely to defeat the proper and legitimate objects of marriage, or to render the continuance of the married relation between the parties perpetually unreasonable or intolerable to the injured party."

The parties intermarried at Missoula, Montana, on February 3, 1941. At that time plaintiff was 68 and defendant 54 years of age. This was plaintiff's second and defendant's third marriage. Each had children of previous marriages, but no issue resulted from this union.

Plaintiff was a man of considerable substance, being the owner of properties in Montana and elsewhere, including a lumber business at Cut Bank. Subsequent to their marriage the parties resided at Cut Bank, occupying a three-room apartment

for the first year or thereabouts. Thereafter they moved into a new six-room house, erected during that period.

We have read the record herein with the utmost care. Without here detailing the evidence on plaintiff's behalf (consisting solely of plaintiff's testimony) we conclude that it totally fails to support the findings hereinabove listed as findings 1, 4, 5, and 6 which, consequently, will not be permitted to stand. As to finding 1, plaintiff's testimony suggests that the defendant, rather than nagging and scolding during the period alleged, was extremely uncommunicative.

We shall discuss the other findings, and the evidence respecting them, separately. First the findings that defendant repeatedly called plaintiff "a big liar," which gave rise to quarrels in the home and thus disturbed his peace of mind and happiness. In this respect the plaintiff testified:

"Q. You allege in your complaint that she called you a· big liar. What about that? A. She called me a big liar a number of times. She repeatedly done that.

"Q. In connection with what? A. I don't know as any one particular thing particularly. One thing, she always accused me of promising to give her the house. Well, of course, if she had lived with me like a good wife, the intention was, of course * * *

"Mr. Hall: I object to this volunteer statement and move that it be stricken as it is not responsive to any question.

"The Court: That latter part is not responsive. It may be stricken.

"Q. What about her calling you a liar repeatedly? A. Well, that came up on different occasions and different times, I cannot say just exactly what, but she knows that she done. that repeatedly."

What plaintiff said in support of this allegation amounted to nothing more than a bald statement that defendant repeatedly called him a liar. How often and on what occasions this occurred he could not recollect. Nor did he state what prompted the accusations on any occasion, nor the apparent reason there-

for, nor the provocation, or lack thereof, nor that the accusation was untrue. Even disregarding defendant's denial of this accusation, plaintiff's testimony is unconvincing, and certainly, of itself, entirely insufficient to establish extreme cruelty. The complaint alleges, and the finding declares, that defendant's conduct in this respect, disturbed—not destroyed—his peace of mind and happiness.

With reference to the finding "that ever since the spring of 1941 the defendant has refused to sleep with plaintiff and persists in sleeping apart from him against his will and wishes," the record discloses the following testimony by the plaintiff:

"Q. Now, you were—you had a bedroom in this apartment. Did she sleep with you, or not? A. She did not.

"Q. Where did she sleep? A. She slept in the front room on the couch.

"Q. Did you say anything to her in regard to that arrangement? A. Oh, I talked to her repeatedly and she said she couldn't sleep with me because I snored.

"Q. And she refused to sleep with you? A. Yes, she did.

"Q. From that time down to the present time, as far as that is concerned? A. She did, unless we were away to Great Falls or Kalispell, when we just had one room.

"Q. And after you had finished this home and moved into it. How many bedrooms were in the home? A. There is two.

"Q. Did the defendant sleep here with you? A. No sir.

"Q. After you had moved into the new house? A. No, she didn't; she wouldn't.

"Q. She wouldn't sleep with you? A. Yes.

"Q. Although you requested her to do so? A. Yes.

"Q. Where did she sleep? A. We had a room there that she slept in, and I slept in the other bedroom.

With reference to this aspect of the case, the defendant testified:

"Q. Now, there is some testimony on the part of Mr. Anderson with reference to your refusal to sleep with him in the

apartment. What is the fact about that, Mrs. Anderson? A. I never have yet refused to sleep with Mr. Anderson, never.

"Q. What was the reason, if it is a fact, that you slept apart from him? A. Yes.

"Q. What was the reason? A. Well, because he did snore and Mr. Anderson did have quite a bit of gas on his stomach; that made it quite uncomfortable. He would occupy the biggest part of the bed, so that we decided that one of us would sleep on the couch, so that I slept on the couch awhile, and then he slept on the couch.

"Q. And that was a matter of agreement between you? A. Yes sir.

"Q. And not any refusal on your part to sleep with him? A. No sir, never.

"Q. And if at any time he made a request for you to sleep with him, did you refuse? A. Never refused Mr. Anderson.

"Q. Now, there were two bedrooms, as I understand, provided in the new home. A. Yes sir.

"Q. And when you moved out there to the new home what sleeping arrangements were made between you and Mr. Anderson? A. Well, we rejoiced to think that we were going to have such nice bedrooms.

"Q. Each one was to have his or her own room? Y. Yes sir.

"Q. After you had moved in there, did you refuse to sleep with Mr. Anderson? A. No, I never refused to sleep with Mr. Anderson.

"Q. You simply continued some other arrangement? A. That is it, yes sir."

It thus appears that except on occasions when they were away from home the parties slept apart practically from the time of their marriage. Plaintiff claims such arrangement was because of defendant's refusal to sleep with him. Defendant asserts that the sleeping arrangements were by mutual agreement, and gave apparently valid reasons why such arrangement was desirable. It is significant that no claim is made by plaintiff that defendant ever refused marital relationship with him;

and it may be fairly inferred from defendant's uncontradicted testimony that she at no time refused such.

Respondent, and apparently the trial court, attach considerable importance to evidence concerning defendant's custom of locking her bedroom door at night. Plaintiff testified that "after dinner she would go into her room and either lock the door and turn on the radio, or she would get her hat on and run down town." Defendant testified that she did lock the door to her bedroom when she went to bed at night, but never before that time. She explained that because prowlers had evidently entered the home on several occasions, she was nervous; that plaintiff had refused to report these occurrences to the police; that the lock or fastening on the back door was broken, which would permit access from the basement to the kitchen. She testified that she had never refused plaintiff access to her room after she had retired. This testimony was not disputed by plaintiff, and, standing undenied, appears to be a logical explanation of her action, although termed "ridiculous" by the trial judge in his opinion.

The plaintiff did not claim and the court did not find that defendant's refusal to sleep with him destroyed his peace of mind and happiness, or. that such refusal defeated the proper and legitimate objects of marriage. We think that, giving full credence to plaintiff's testimony, it does not, standing alone, establish extreme cruelty as defined by statute upon which plaintiff relies. No authority supporting a contrary view has been furnished by respondent or found by the court. Of course this circumstance must be considered with others shown by plaintiff in determining whether plaintiff substantially established the extreme cruelty relied on by plaintiff and found by the court.

During plaintiff's direct examination, he was permitted to testify concerning certain difficulties between the parties arising out of business transactions. This was objected to on the ground "that there is no allegation in the complaint with reference to an interference by the defendant with the business, or any business transaction with the defendant, it being the cruelty

being contained in the three categories set forth in paragraph five which we are called upon to meet by our evidence.'' The objection was overruled, and plaintiff testified, in substance, that he had quarrels with his wife over her refusal to sign certain papers; that in 1941 he asked her to sign an oil lease, which she refused to do until the elimination therefrom of certain provisions concerning her dower interest. Again in 1943 she refused to sign a deed to a 40 acre tract which plaintiff required in connection with the dissolution of a partnership. This was in August or September of 1943. Plaintiff testified on direct examination: ''I asked her to sign it then, and she said she wouldn't do it. I said I have to go on with my business. If she don't sign it I have to file for a divorce.'' The apparent implication of this testimony is that he was determined to have the deed executed, and intended to eliminate the necessity of his wife's joining in its execution by divorcing her. It appears from his testimony that she also refused to join in a conveyance to certain real estate in North Dakota; that such refusal on her part made it ''most unpleasant for me.'' Shortly after defendant's refusal to sign the deed first mentioned plaintiff moved from the family home and established living quarters in a room over his lumber yard, apparently in August, 1943. In this connection he testified:

''Q. Why was it that you left the home that you had provided for yourself and your wife? A. Well, because I had to have this here divorce. I didn't want to live with her after the divorce was filed, or started.'' With reference to his reason for leaving home, plaintiff on cross-examination testified:

''Q. And as a matter of fact the main reason you left home in August, 1943, was the refusal of Mrs. Anderson to sign papers? A. Yes, that was, and of course the unpleasantness.

''Q. Did I understand you to say that you told Mrs. Anderson that if she didn't sign the paper you were going to sue her for a divorce? A. I told her I would have to do that, yes.

''Q. And it was immediately after that that you left the home? A. Yes. * * *

"Q. So that there won't be any question about it, Mr. Anderson, you told her sometime in early August, 1943, that if she didn't sign the paper you were going to sue her for a divorce? A. Yes sir.

"Q. And when she didn't sign the paper, or refused to sign it, you left home and filed an action for divorce, didn't you? A. Quite shortly after. I went and seen my attorney and I think my attorney had to go away and stay away for awhile, but it was shortly afterward anyway.

"Q. And the thing that brought such a matter to a head was her refusal to sign this paper? A. Yes, mostly that."

And on re-direct examination:.

"Q. And it was these other circumstances and her treatment of you that influenced you in bringing this action for divorce? A. Yes sir.

"Q. And it was not solely on the ground of her refusal to sign these deeds? A. That was the final trouble that we had.

"Q. That was the culmination of the other difficulties? A. Yes, the accumulation."

Analysis of plaintiff's testimony impels us to the conclusion that the principal reason for his leaving home was defendant's refusal to sign the instruments; and further that such refusal was his real reason for instituting this action. This is fortified by the following testimony by defendant:

"Q. What reason did he give for leaving? A. I wouldn't sign the deed to the land.

"Q. That was the only reason? A. That was the only reason he told me. He told me the marriage was only commercial anyway. He said he never loved me, he only married me for convenience.

"Q. After the divorce action had been filed, did you have any conversation with Mr. Anderson as to his reasons for wanting it? A. Yes, he came back and asked for a blanket and some kettles to cook in, and I told him I thought I had given him all the blankets he had before he was married, so that I said, 'Pete, why did you say those terrible things about me in your com-

116

plaint?' He said, 'What did I say?' I said, 'You said I abused you.' 'Well', he said, 'what else could say? I didn't know of anything else to say.' 'Well,' I said, 'you know you left, why did you leave?' He said, 'Because you wouldn't sign the deed.' I said, 'What else could I do?' He said, 'You caused me mental worry.' I said, 'Why didn't you put that in your complaint then?'

"Q. And he gave that as his reasons for filing the divorce action? A. Yes * * * he said, 'I waited a whole week for you to come down and sign those papers, when you didn't come, what else was there left for me to do? I had to go ahead.'

"Q. That is to file the divorce action? A. Yes sir."

This evidence was not controverted by plaintiff.

Without determining whether evidence with respect to defendant's refusal to sign these instruments should have been excluded because not alleged, we hold that it manifestly was no proof of extreme cruelty. Defendant was within her legal rights in such refusal to sign away her interest in the property involved. As is said in Hofman v. Hofman, 40 Ind. App. 476, 82 N. E. 477: "* * * So far as it relies on cruel treatment, the only issuable fact averred is that appellant refused to join with appellee in the execution of deeds for his real estate. The statute giving to a married woman an interest in her husband's real estate, in the conveyance of which she has not joined, was intended for her benefit and her protection, and if, by standing upon her right under this law, she is guilty of a marital offense against her husband that would entitle him to a divorce, it would be better that the law should be repealed. Such is not the case, however, and the marital relation is not to be cast aside upon any such trivial and insufficient ground." See also Schlect v. Schlect, 99 Cal. App. 163, 277 Pac. 1065.

Considering plaintiff's testimony alone, we think that it established at best incompatibility between the parties, or as the plaintiff put it, "unpleasantness." We are convinced that such evidence is wholly insufficient to support the finding of the inflic-

tion, by defendant upon plaintiff, of extreme cruelty as defined by statute and made a ground for divorce.

It is our view that the plaintiff failed to sustain the burden of proving the allegation of the infliction of extreme cruelty, which, of course, he must do before becoming entitled to a decree. To make our position clear, we think that, accepting plaintiff's testimony as true, it does not, as a matter of law, establish extreme cruelty upon which his complaint is based. In Argenbright v. Argenbright, 110 Mont. 379, 101 Pac. (2d) 62, 64, this court said: "While our statute provides that such acts as fall within the definition of extreme cruelty are grounds for divorce if they are justly and reasonably of such a nature and character as so to destroy the peace of mind and happiness of the injured party, or entirely to defeat the purposes and legitimate objects of marriage, or to render the continuance of the married relation between the parties perpetually unreasonable or intolerable to the injured party, nevertheless the burden is on the plaintiff to show that the effect of such acts creates the condition which the statute condemns, which we believe she has failed to do in this case. The evidence, weak as it is, shows little more than incompatibility, which is not a ground for divorce in Montana in the absence of a showing of the result specified in the statute."

While this court will not disturb findings of the trial court where supported and justified by substantial evidence, it is clearly our duty to set aside findings not so supported or justified. Putnam v. Putnam, 86 Mont. 135, 282 Pac. 855; Moulton v. Irish, 67 Mont. 504, 218 Pac. 1053. We have not undertaken to weigh the evidence, which is the province of the trial court; we hold that, giving the evidence its full effect, it does not sustain the material allegations of the complaint or the finding of the trial court. The trial court concludes, as appears from the opinion, that defendant's principal interest in the marriage "was based upon the financial consideration which she thought would flow therefrom." Whether this conclusion is justified is immaterial, since the only question involved

is whether the plaintiff produced evidence sufficient to prove the extreme cruelty alleged. We hold that he did not. From a careful study of the record we are convinced that the administration of substantial justice requires a reversal of the judgment herein. Since the plaintiff has died pending appeal, further proceedings in the matter are impracticable.

The judgment is reversed and the cause remanded with directions to dismiss the complaint and vacate the judgment.

Mr. Chief Justice Johnson and Associate Justices Adair and Angstman concur.

Mr. Justice Morris:

I dissent. This action was tried to the Court sitting without a jury. The evidence is in sharp conflict. The trial judge, Honorable John Hurly of the Seventeenth Judicial District, has had many years of experience as a trial judge, was formerly a justice of this court, and is highly regarded by the bar of the state. The forceful expressions contained in his findings and conclusions in the case at bar no doubt sprang from his firm conviction that the plaintiff testified truthfully and that the defendant did not.

The applicable rule in such circumstances is clearly stated in the case of Fousek v. Deforest, 90 Mont. 448, 4 Pac. (2d) 472, 473, where this court said: "The rule is firmly established that findings of the trial court in an equity case will not be disturbed unless the evidence clearly preponderates against them (National Bank of Anaconda v. Yegen, 83 Mont. 265, 271 Pac. 612), and due allowance must be made for the more advantageous position occupied by the trial judge who observed the conduct and appearance of the witnesses. Barnard Realty Co. v. City of Butte, 55 Mont. 384, 177 Pac. 402."

In the case of In re Noyes' Estate, 40 Mont. 178, 189, 105 Pac. 1013, 1017, this court, speaking thru Mr. Chief Justice Brantly, said: "It may well be said that Conant's testimony is not satisfactory, in that in some important particulars he is not positive and definite in his statements; nevertheless the credit to be given it was a question exclusively within the province of the

trial court to determine, and its determination thereon is conclusive.''

''A jury having been waived, the findings of the trial court have the same efficacy as a verdict.'' Davis v. McEwen Bros., 9 Cir., 193 F. 305, 311, 113 C. C. A. 229 (a Montana case). The rule has the support of a long line of decisions by this court.

The rule being firmly established that the verdict of the jury, where a jury is had, and the findings of the court where the jury is waived, or the right to a jury is not authorized, this court is without power to invade the province of the trial court and become the trier of the facts in place of the court below, except where there is no substantial evidence to sustain the judgment of the trial court. But it is said, ''the plaintiff failed to sustain the burden of proving the allegation of the infliction of extreme cruelty.'' Let us review the evidence in that behalf. The parties were married February 3, 1941. The plaintiff, the managing partner in a lumber yard at Cut Bank for many years, had accumulated considerable property. His first wife died in 1935, and there were four children from that marriage, three daughters and a son, all grown and the daughters all married. The defendant had been twice married before marriage with the plaintiff. The plaintiff said he had difficulty with the defendant ''shortly after we were married.'' He invited one of his daughters and her husband to Sunday dinner; his wife was mad and would not talk to him for two or three days. He did not know what was the matter and he asked her and she told him he had invited them without consulting her. His wife was sulky and would not speak to him; she would not sleep with him, but slept in the front room on a couch. They lived in the ''Buttrey Apartments,'' and had but one bedroom. He complained and she said she could not sleep with him because he snored. They lived in the apartment less than a year and he, in the meantime, in accordance with a promise to her, built a modern home with six rooms and a bath, the upstairs not being finished. The cost of the new home was ''seven or eight'' thousand dollars. The defendant continued to refuse to sleep with.

him. Her demeanor was "fairly good" the first year while the new home was being built. "After we got the house finished and furnished, then she didn't seem to have any use for me. If she was sitting in the front room, and I would come in there, she would run out and go into her room and lock the door * * *" and she kept on that way for at least a year. "After dinner she would go into her room and either lock the door and turn on the radio or she would get her hat on and run downtown. I don't know where she went." She generally came home around ten o'clock." She made derogatory remarks about one of his daughters; said she heard the daughter was living with another man, "She didn't want anything to do with them (his) children because they were Indians." He said his children had Indian blood. "Any time she had an opportunity she wanted to impress upon my mind that she (his daughter) was undesirable for her (the defendant) to associate with." Over objection the plaintiff was allowed to testify that the defendant refused to sign deeds to certain property which he desired to execute in the course of his business interests in oil and gas lands. She grounded her objection on the fact that by signing the deed she would release her dower interest. There is nothing in the record to indicate the plaintiff sought to defeat her dower interest in his land. It is worthy of note that she had certain absolute rights in plaintiff's personal property and would have in case of his death only a life estate in his realty, and converting realty into cash was to her advantage. Paragraph 5 of the Complaint is as follows:

"That the defendant for more than two years last past has perpetually nagged, fumed and scolded at the plaintiff and treated him in an abusive and scornful manner; that defendant repeatedly called plaintiff 'a big liar', which gave rise to quarrels in the home and thus disturbed his peace of mind and happiness;

"That ever since the spring of 1941 the defendant has refused to sleep with the plaintiff and persists in sleeping apart from him against his will and wishes;

"That plaintiff's former wife is deceased and there were

several children, the issue of his former marriage; that ever since the marriage of the parties hereto the defendant has continually run down and made slanderous remarks against his said children and has refused to make them welcome visitors in his home, all of which has caused plaintiff great mental suffering. That defendant's tirades against his said children are made maliciously and with the intent on the part of the defendant to hurt the feelings of plaintiff and to vex and annoy him.

"That defendant for more than one year last past has repeatedly and maliciously accused the plaintiff of unchastity and marital infidelity, all of which was and is wholly false and untrue and without any foundation in fact whatsoever and same caused plaintiff great anguish of mind and grievous mental suffering."

The facts alleged are substantially supported by the plaintiff's testimony. The defendant's testimony denies that of the plaintiff in essential points, and thereby brings the testimony into sharp conflict. It is significant, however, that defendant admitted that the plaintiff's snoring annoyed her, and she mentioned that the plaintiff had gas on his stomach, leaving the impression that his expulsion of such gas was offensive, and that, with plaintiff's snoring, was her excuse for refusing to sleep with him. She also, amongst other annoying acts, accused him before her daughter of trying to poison the daughter's mind against the defendant. The majority finds nothing in the situation to justify plaintiff's allegation of cruelty. The law in my opinion would find the acts enumerated, when persisted in, clearly inimical to domestic felicity, and locking her bedroom door against the plaintiff is alone sufficient to entitle the plaintiff to a decree of divorce. However, the defendant endeavors to take the force out of the fact that she locked her door against the plaintiff by claim of fear from housebreakers. She expressed no concern about any evil that might come to her husband by a housebreaker, obviously in that, as in other matters, she was indifferent as to what might occur to him. The trial court

concluded these controverted questions in favor of the plaintiff. It was solely within the province of that court to resolve such facts. He had the witnesses before him and could observe their demeanor, and it was for that court and not this to hear and determine the facts.

Dealing further with what acts of one party to a divorce proceeding constitute cruelty, any reasonable mind must concede that what would be cruelty to a "rough neck" who was immune to criticism and hard knocks would be no criterion if the same reproofs were directed to one of keen sensibilities and reserved emotions. In other words, what would constitute cruelty when directed to one person might meet with utter indifference when directed to another. This court said in Williams v. Williams, 85 Mont. 446, 278 Pac. 1009, 1010: "The particular acts of cruelty of which complaint is made are not in themselves determining factors, but the question is whether the acts of cruelty are of such a nature and character as to destroy the peace of mind and happiness of the injured party. Donaldson v. Donaldson, 31 Idaho 180, 170 Pac. 94; Fleming v. Fleming, 95 Cal. 430, 30 Pac. 566, 29 Am. St. Rep. 124."

In Donaldson v. Donaldson, supra [31 Idaho 180, 170 Pac. 95], cited in the Williams case, above, the Court quotes the following language: "Extreme cruelty is a term of relative meaning, and a course of conduct that would inflict grievous mental suffering upon one person might not have that effect upon another. Hence no fixed legal given case can be laid down. The judge rule for determining its existence in any who tries the case and has the parties before him for observation in the light of the evidence is the one to whom the law commits the determination of this question in the first instance, and this court will not disturb a finding that particular acts constitute grievous mental suffering, unless the evidence in support of the finding is so slight as to indicate a want of ordinary good judgment and an abuse of discretion by the trial court."

In Fleming v. Fleming, supra [95 Cal. 430, 30 Pac. 567], also cited in the Williams case, the Court said: "The habits and

dispositions of different married persons vary so much that it is impossible to lay down any universal rule for the determination of what indignities should be regarded as grounds of divorce under the statute. Among savages, the conduct imputed to this defendant might not be regarded as reprehensible. The legislature has necessarily employed general words, and left each case to be determined according to its own peculiar circumstances by the good sense and judgment of courts and juries. 'Whether in any given case there has been inflicted this "grievous mental suffering," is a pure question of fact, to be deduced from all the circumstances of each particular case, keeping always in view the intelligence, apparent refinement, and delicacy of sentiment of the complaining party.' Barnes v. Barnes '[95 Cal. 171], 30 Pac. 298 [16 L. R. A. 660] filed June 18, 1892. We cannot, as a matter of law, say that the conduct charged in the complaint did not inflict upon the plaintiff grievous mental suffering. The court below has found as a fact that it did, and it is the province of that court, and not our own, to determine the facts.''

In Barnes v. Barnes, supra [95 Cal. 171, 30 Pac. 299], the Court said: ''It may be true that there is 'no scale by which to gauge the purely mental susceptibilities and sufferings' of another, nor is it necessary that there should be any such exact measure. The common judgment of mankind recognizes the fact that there may be unfounded charges and cruel imputations which are not more easily borne than physical bruises, and the necessary effect of which is to cause great mental distress to the person against whom they are made. Whether in any given case there has been inflicted this 'grievous mental suffering' is a pure question of fact to be deduced from all the circumstances of each particular case, keeping always in view the intelligence, apparent refinement, and delicacy of sentiment of the complaining party; and no arbitrary rule of law as to what particular probative facts shall exist in order to justify a finding of the ultimate facts of its existence can be given. As said by Mr. Justice McFarland in his dissent opinion in Waldron v.

Waldron, supra [85 Cal. 251, 24 Pac. 649, 858, 9 L. R. A. 487]:
'Every case where a divorce is sought on this ground must depend upon its own particular facts; and a correct decision must depend—as most cases depend—upon the sound sense and judgment of juries and courts.' "

The judgment should be affirmed.

On Petition for Rehearing.

Per Curiam.

Respondent urges that the decision herein overlooks section 5735, Revised Codes, which provides: "The effect of a judgment of divorce is to restore the parties to the state of unmarried persons." Because of this provision, it is urged, this court has no right or jurisdiction to change the status of the parties as unmarried persons existing at the time of plaintiff's death. Of course, no court has power to revive the physical relationship of man and wife ended by death. But this is not to say that an appellate court has not the power, after death of one of the parties, to annul and set aside a judgment of divorce upon appeal, as in other cases. The whole question on appeal is whether the decree appealed from is in fact a judgment of divorce duly and properly rendered so as to be entitled to all the force and effect of a valid adjudication. We think that the judgment appealed from becomes final, in the sense urged, only upon determination of the appeal in respondent's favor, and that the effect of the appeal is to suspend the judgment until and unless held valid on final determination of the appeal. While the judgment may be final so far as the trial court is concerned, it is not final in the sense that it is not subject to be reversed and set aside on appeal. Section 9731, Revised Codes, provides for appeal from a final judgment entered in an action in a district court. Appeals lie from final judgments in divorce actions as in others. Thus, while this court could not now restore the purely physical relationship of man and wife which was terminated by the death of the plaintiff, it has authority, on appeal, to declare that the divorce decree was erroneous and invalid and of no effect, and that, con-

sequently, such relationship continued to exist until the moment of plaintiff's death.

Respondent very forcefully and ably contends that since the ▮ only question involved is the purely personal relationship of the parties, the appeal must abate upon the death of one of them prior to its determination. This argument would be sound were the basic premise true. But property rights of the parties are also necessarily here involved, as such rights are lawful concomitants of the marriage status. It is true that no property rights were specifically adjudicated by the decree, but it is equally true in this case that apparently valuable property rights of the wife, including dower and succession rights, will be effectively taken away from the wife should the decree be permitted to stand or the appeal abated. Many cases announce the rule that where only the personal relationship of the parties to a divorce action is expressly involved, an appeal will abate upon the death of one of the parties pending its determination. But the rule is almost universally recognized that such is not the case where property interests are involved. And we think· the best and just rule is that it is not necessary that the decree itself adjudicate those rights in express terms. See Annotation to Lemp v. Lemp, Nev., 141 Pac. (2d) 212, (not yet reported [in State Reports]), found in 148 A. L. R. 1124, and cases cited.

This court will take judicial notice of the statutes of Montana ▮ attaching to the marital relationship property rights in the wife in the form of dower and succession rights in the husband's property, and the right to his support. The record in this case shows ownership of property by the husband in which, by operation of law, the wife had property rights and interests.

It is ordered that this further opinion be added to the opinion herein.

Per Curiam order concurred in by Mr. Chief Justice Howard A. Johnson and Associate Justices Adair and Cheadle.

Rehearing denied January 31, 1946.