No. 12965

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

WILLIAM C. MAGELSSEN and CHARLOTTE T. MAGELSEEN,

Plaintiffs and Respondents,

-vs-

WILLIAM G. MOUAT, Trustee, and WESTERN BANKS OF
BILLINGS, Billings, Montana, a Montana Corporation,

Defendants and Appellant.

WESTERN BANK OF BILLINGS,

Third-Party Plaintiff,

-vs-

HARRISON FAGG,

Third-Party Defendant.

Appeal from: District Court of the Thirteenth Judicial District,
Honorable E. Gardner Brownlee, Judge presiding.

Counsel of Record:

For Appellant:

Davidson, Veeder, Roberts & Baugh, Billings,
Montana
John R. Davidson argued, Billings, Montana
William G. Mouat appeared, Billings, Montana

For Respondents:

Moses, Kampfe, Tolliver and Wright, Billings,
Montana
D. Frank Kampfe argued, Billings, Montana
Crowley, Kilbourne, Haughey, Hanson and Gallagher,
Billings, Montana

Submitted: June 16, 1975

Decided: JUL 3 1 1975

Filed: 'UL 3 1 1975

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment of the district court, Yellowstone County, ordering defendants William G. Mouat, Trustee, and Western Banks of Billings, to deliver to plaintiffs a deed conveying them any right, title and interest of the banks in certain real property.

William C. Magelssen and Charlotte T. Magelssen brought this action to recover the sum of $55,000 paid to defendant banks by the fidelity insurer of the banks' employees, and to require the banks to reconvey real property conveyed to the banks under a trust indenture foreclosure sale. The banks counterclaimed, asking the district court to:

(1) ratify and affirm the foreclosure prodeedings;

(2) order the payment by Magelssens of the banks losses ($14,500) together with interest, representing the difference between the insurance payment to the banks ($55,000), and the actual loss to the banks ($69,500), occasioned by loans made by William Magelssen to one George Manuel.

Two issues are raised on appeal.

1. Whether the evidence supports the district court's decision ordering the banks to deliver to Magelssens a deed conveying to them all the right, title and interest of the banks evidenced by the trust indenture dated September 9, 1971, and all right, title or interest obtained by the banks upon the trust indenture foreclosure proceedings.

2. Whether the court erred in failing to award the banks the sum of $14,500 together with interest and attorney fees and costs in foreclosing the trust indenture.

It is necessary to set out in some detail the factual situation in order to distill the rather limited legal questions involved in the case.

- 2 -

The fiscal maneuvering of William C. Magelssen serves as the background to assess who owes whom--the problem presented by the issues. For some twenty years after graduating from college plaintiff Magelssen worked in various banks in this state holding various positions from teller and bookkeeper, to the head of the mortgage and real estate department of his last employer. He became an assistant to the vice-president and later vice-president of the Security Bank of Billings, Montana. These twenty years of banking experience resulted in his decision, in 1970, to organize his own banking empire and during that year he organized two banks, the Western State Bank and the Western Bank of Billings, each capitalized at $500,000. To have a controlling interest in the banks he purchased 3,210 shares, 66.4% of the shares issued, at $105 per share, for a total cost of $674,100. To finance this purchase he entered into these fiscal dealings:

$40,000 from his savings.

$40,000 borrowed from the First National Bank in Glendive, Montana, and the Midland Bank in Billings, Montana.

$300,000 borrowed from his father.

$50,000 borrowed from the Western Banks with W. B. Van Fleet as accomodation party.

$100,000 borrowed from Western Banks, with Lloyd Hostetler as accomodation party.

$100,000 borrowed from Western Banks to pay Voegele on a loan.

$30,000 borrowed from Western Banks with Mardaus as accomodation party.

$25,000 borrowed from Western Banks with Harrison Fagg as accomodation party.

Total - $685,000.

To secure the accomodation parties to his borrowing from

his own banks Magelssen gave the parties his own personal notes. To secure the $300,000 loan from his father he gave his common shares in both banks as security. All of this was in July, 1970. On October 19, 1970 his father called up his loan. At this point things went from bad to worse.

To get money to cover the father's loan of $300,000 plus interest, Magelssen contacted a money broker from Ohio named George Manuel in an effort to secure a term capital loan for the two Western Banks of Billings, and a proposed bank in Bozeman, for some $900,000. Manuel came to Billings and Magelssen agreed to pay him a fee of from 3% to 5% for obtaining such a loan. Manuel obtained a 90 day loan from a Florida company, Fred Brown & Co., which was used to cover the $300,000 plus interest loan of his father. He then gave Manuel $7,475 as an initial fee for obtaining the loan and obtained promises from Manuel for further financing from Switzerland sources.

On October 20, 1970, the two Western Banks of Billings, through Magelssen, each loaned Manuel, $35,000. Manuel gave as security to each bank his personal promissory note. At the same time Manuel deposited the $35,000 obtained from the Western State Bank in Magelssen's personal account. In addition, as "collateral" for the two notes for $35,000 each, Manuel gave Magelssen, for the banks, certain stock in First United Trust Co., a real estate investment trust. Manuel told Magelssen that the stock was listed on the New York exchange, but on investigation the stock was worthless. Manuel ended up in prison but not for his operations in Montana.

From the proceeds of the other $35,000 loan to Manuel by the Western State Bank, Manuel took $5,000 in cash and deposited $30,000 in his personal checking account.

From the above abbreviated background of fiscal operations

- 4 -

of the two Western Banks, it was no surprise that various banking officials became alarmed and early in 1971 both state bank examiner officials and the F.D.I.C. told plaintiff Magelssen and his board that either a purchaser would have to be found for the banks or they would be closed.

As a result of the problems raised by the banking officials, Magelssen was ousted from his position as president of the two Western Banks and the Board of Directors hired one George E. "Bud" Hansen, one of its directors, to secure a purchaser. Hansen had two purchasers, one deal fell through, but in August a sale was consummated with one John Vucurevich to purchase the capital stock of the banks. The original offer was $1,000,000, which was re-fused. Subsequently, it went to $1,025,000 which resulted in the sale. That amount was some $25,000 short of paying off all the obligations of the banks and Hansen testified that Vucurevich and one of his officials, a Jack Dano, offered to take a second mort-gage on Magelssen's home in the amount of $25,000, which was agreed upon and done by Magelssen and his wife. It is this amount issue one on appeal is directed to.

As part of the Vucurevich purchase, Magelssen received as consideration for selling his stock the complete payment of his father's obligation (he had reborrowed $300,000) plus the payment of all the accomodation loans with interest. In addition, he testified he was promised the Manuel notes which by that time had been written off by the bank but were still in the banks' posses-sion. Magelssen was paid $103.97 per share for his stock while all other stockholders received $110. The stock had been purchased for $105 per share.

On January 8, 1971, the Insurance Company of North America commenced a file on the Western Banks of Billings that ultimately resulted in the payment to those banks, on February 11, 1972, an amount of $55,000. This was a compromise amount for the banks

- 5 -

claimed $70,000, which was the amount written off by the banks of the two Manuel notes.

At the time of the purchase Magelssen arranged that the accomodation notes of Mardaus, Van Fleet and Fagg were paid off. However, Magelssen argues that as to the Fagg note, the banks tried to get paid twice on it. Once through the foreclosure on his trust indenture, and the second time through a law suit filed against Fagg, which was finally dropped. Magelssen argues that the Manuel notes were likewise to have been cared for and the notes returned to him as fully satisfied. Further, that the banks' later action in obtaining a $55,000 settlement from the insurance companies should have either been returned to him or at least applied against his $25,000 note. The banks argue that although they paid no separate consideration for the Manuel notes they are the owners of the notes by virtue of the purchase of the capital stock and are accordingly entitled to the settlement.

The trial court after a full hearing and after considering all the evidence submitted by the various depositions, entered its own findings of fact, conclusions of law and judgment, providing in pertinent part:

> "'That $55,000.00 is what is now causing the trouble. The banks claim the money alleging that the Manuel notes are the property of the banks and therefore the money belongs to the banks. The Plaintiffs claim the money alleging that had the Manuel notes been liquid assets at the time of the sale to Vucurevich the cash the Plaintiffs would have received would have been $70,000 greater, therefore the money belongs to the Plaintiffs. The Plaintiffs also allege that the agreement with Mr. Vucurevich was that the Manuel notes were to be the property of the Plaintiffs and therefore any money brought in based on those notes belongs to the Plaintiffs.'
>
> "Without doubt at the time of the bank sale neither Plaintiffs nor Mr. Vucurevich believed the Manuel notes had any value. The negotiations undoubtedly resulted in the parties understanding that Mr. Vucurevich would not pay one cent for those notes, and therefore Plaintiffs were stuck

- 6 -

with that loss. There is some conflict in the
testimony as to physical delivery of the notes;
the Plaintiffs allege they were to receive the
actual notes. The court finds some basis for
this belief, especially from the testimony of
Mr. Jack P. Dano regarding non-delivery of the
notes.

"The court has little trouble finding that Mr.
Vucurevich did not pay any consideration for the
notes because he and the Plaintiff felt they were
worthless. Neither does the court have any
trouble finding that Mr. Vucurevich would have
paid a consideration for the notes had they been
valid obligations. It was not proved to the sat-
isfaction of the Court that Mr. Vucurevich actually
bought the two Manuel notes from the Plaintiffs (in
effect).

"The court would have little trouble finding that
neither party is entitled to the $55,000, but it is
on hand, and the court concludes it should be
divided in some manner between the parties.

"Therefore,

"IT IS ORDERED:

"1. That Harrison Fagg is not obligated to any of
the parties herein;

"2. That all claims, cross claims or counter claims
of any party is disposed of by this judgment,
whether specifically referred to or not.

"3. That the banks keep the $55,000.00, but they
are ordered to deliver to the Plaintiffs a deed
conveying to the Plaintiffs any right, title or
interest the banks have and to the property covered
by the note and trust Indenture dated September 9,
1971, including any right, title or interest obtained
by foreclosure proceedings;

"4. All parties are to pay their own costs."

To determine whether there is sufficient evidence to
support the trial court's findings and conclusions, we first examine
the purpose of the purchase of the bonds of the Insurance Company
of America by the two Western Banks of Billings, referred to as a
bankers' blanket bond. The bond was purchased by each bank, not
by Magelssen, and one of its provisions was to cover "Dishonesty":

"A loss through any dishonest act of any of the
employees committed anywhere and whether committed
alone or in collusion with others, including loss,
through any such act of any of the employees, of
Property held by the Insured for any purpose or in

- 7 -

any capacity and whether so held gratuitously or not, and whether or not the Insured is liable therefor."

From the testimony of Mr. Veeder, Claims Supervisor of the Insurance Company of North America, who finally negotiated the settlement of $55,000 with the two banks, and all of the documentary evidence introduced concerning that settlement, it is obvious that the settlement was made under the quoted "Dishonesty" acts clause of the policy. Too, from the same source of evidence, it is clear the acts referred to were the acts of Magelssen when he was an officer of the two banks in his dealings with Manuel.

To now argue Magelssen can personally benefit from those acts through insurance he had purchased to protect the banks is untenable. The policies were to protect the banks and not Magelssen and to argue that he sold his stock at a lower price than the other stockholders, or that all the new owners had declared the Manuel notes of no value, just begs the issue. Magelssen cannot, and should not, benefit from his own wrongdoing. His note and those of Manuel became the property of the two banks at the time of the sale.

Plaintiff Magelssen cites Gilmore v. Gilmore, ____Mont. ____, 530 P.2d 480, 32 St.Rep. 23, 26; Stromberg and Brown v. Seaton Ranch Co., 160 Mont. 293, 306, 502 P.2d 41, to support his proposition on appeal that:

> "We must indulge the presumption that the judgment of the district court is correct and will not be disturbed unless there is a clear preponderance of evidence against it when viewed in the light most favorable to the prevailing party."

We have no argument with the case authority cited but there is like authority for this Court to set aside a trial court's findings where there was no substantial evidence as a basis for its findings. If a clear and satisfactory showing is not made in

support of the findings, this Court, in proper cases, will set them aside. Gray v. Grant, 62 Mont. 452, 206 P.2d 410; Kasala v. Kalispell Pee Wee Baseball League, 151 Mont. 109, 439 P.2d 65; Judson v. Anderson, 118 Mont. 106, 165 P.2d 198.

We find the trial court erred in failing to award the banks the sum of $14,500, together with interest, attorney fees and costs in foreclosing the trust indenture.

The findings of fact, conclusions of law, and judgment are set aside. The cause is returned to the trial court with directions to enter judgment for appellant-defendants.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

- 9 -