No. 14304

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

MARJORIE C. SWANSON,

                    Plaintiff and Appellant,

    -vs-

ST. JOHN'S LUTHERAN HOSPITAL, a
Montana Corporation,

                    Defendant and Respondent.

---

Appeal from:  District Court of the Nineteenth Judicial District,
              Honorable Robert M. Holter, Judge presiding.

Counsel of Record:

    For Appellant:

        Fennessy, Crocker and Harman, Libby, Montana
        David Harman argued, Libby, Montana
        Jean Galloway Koreski argued, Washington, D. C.

    For Respondent:

        Lawrence H. Sverdrup, Libby, Montana
        Smith Law Firm, Helena, Montana
        Chadwick Smith argued, Helena, Montana

---

                            Submitted:  November 16, 1978

                              Decided:  JUN 13 1979

Filed:  JUN 13 1979

*Thomas J. Kearney*
                                        Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This is an appeal from the District Court, Nineteenth Judicial District, Lincoln County, on a judgment against Marjorie C. Swanson who was discharged from her employment as a nurse-anesthetist at St. John's Lutheran Hospital in Libby. She brought her action in the District Court upon the ground that she had been wrongfully dismissed from her employment because she had asserted her rights under former section 69-5223, R.C.M. 1947, now section 50-5-502 through -505 MCA.

Former section 69-5223, has been referred to in briefs before this Court, as it was during its legislative history, as the "conscience statute". For ease of reference, we will use that term here, although the Court implies nothing by the use of that term. The conscience statute defined certain rights of medical persons who are confronted with sterilization procedures as a part of their employment. Specifically, the conscience statute includes these provisions:

"69-5223 . . .

"(2) All persons shall have the right to refuse to advise concerning, perform, assist, or participate in sterilization because of religious beliefs or moral convictions. If requested by any hospital or health care facility, or person desiring sterilization, such refusal shall be in writing signed by the person refusing, but may refer generally to the grounds of 'religious beliefs and moral convictions'. The refusal of any person to advise concerning, perform, assist, or participate in sterilization, shall not be a consideration in respect to staff privileges of any hospital or health care facility, nor a basis for any discriminatory, disciplinary, or other recriminatory action against such person, nor shall such person be liable to any person for damages allegedly arising from such refusal.

"(3) It shall be unlawful to interfere
or attempt to interfere with the right
of refusal authorized by this section,
whether by duress, coercion or any other
means.  The person injured thereby shall
be entitled to injunctive relief, when
appropriate and shall further be entitled
to monetary damages for injuries suffered."

The Court notes parenthetically that the legislature
adopted virtually the same provisions with respect to
abortion procedures in former section 94-5-620, R.C.M.
1947, now section 50-20-111 MCA.

The two-fold purpose of the conscience statute is
plain:  (1)  It mandates that no person can be compelled
to participate in sterilization against his moral or
religious principals; (2)  It prohibits firing any person
for refusing to participate in sterilization on such
grounds.  The law is statewide in its effect, embracing
as well the largest metropolitan hospitals and clinics
and the smallest hospital or medical office in Montana.

Marjorie Swanson is a Certified Registered Nurse-
Anesthetist (CRNA) who was employed by the hospital for
eight years prior to discharge in her professional
capacity as a nurse-anesthetist.  In the four years
preceding August 1977, she had assisted professionally
in twenty surgical procedures that involved sterilizations
and in the year preceding August 1977, six such procedures.

On August 19, 1975, she assisted professionally in
a surgical procedure that was listed on the surgery schedule
in the hospital as a "D and C", a dilatation and curettage.
Immediately prior to the operation, in examining the chart
of the patent, she had discovered that an abortion permit
was required by the hospital medical staff for this
particular procedure.  Nevertheless, she went ahead
professionally and gave anesthetic to the patient.  During

-3-

the course of the procedure she observed that a human fetus was removed from the uterine lining of the patient, part by part, by the use of instruments. Her observation of the dissection and removal of the fetal tissue caused her to be "horrified and very upset".

August 19, 1977 was a Friday. Over the weekend, she learned that a procedure described as a bilateral part-salpingectomy, a tubal ligation, was scheduled for Tuesday, August 23, 1977. The operation had been listed on the surgical schedule posted by the hospital on August 10, 1977, but the anesthetist first became aware of it over the weekend immediately preceding the Tuesday operation date. On Monday, August 22, 1977, at about 10:00 a.m., she advised the administrator of the hospital, Dan Wigart, that she would not participate in the tubal ligation, which is a sterilization procedure. The administrator "tried to convince [her] that [she] could participate in it". He also indicated that she should be able to assist at therapeutic abortions. Wigart asked her to withhold making a final decision until he had spoken to her local priest, and she said she would also speak to him, although Wigart reported "she did have a sense of finality in it at that time."

Rev. Charles Strom testified that on the afternoon of August 22, at about 3:00 p.m. he was approached by Dan Wigart who asked him for his help and "sounding out about her attitude on sterilization". In fact, Dan Wigart testified in part:

> ". . . She repeated two or three times
> 'If I have to resign, I will. But
> I am not going to do tubal ligations.'
> I asked her to give me some background
> on this. I asked her to withhold her
> final decision until I talked to Father

Strom and Dr. Seifert, and also the two
physicians who were involved in the D
& C. I made every attempt to try to
reduce her anxiety about the procedure.
I felt that there were other factors
that were bothering her. And I hoped that
Father Strom would have talked to her
and supported her from the standpoint
that participation in a tubal ligation
does not represent direct participation.
This is something that Dr. Seifert and
I had talked about that same morning."

At 7:00 p.m. that evening, Marjorie Swanson called
Wigart and informed him that her mind was made up and
she was not going to participate in tubal ligation.

Thereupon Wigart obtained the services of a nurse-
anesthetist from Bonners Ferry, Idaho, and the surgery
went ahead as scheduled.

At 4:30 p.m. on August 23, 1977, Wigart telephoned
Marjorie Swanson at her home and informed her that she
was discharged from her position as nurse-anesthetist at
the hospital. She requested that he give her a written
statement of the reasons for her discharge. He did so,
sending her a letter in full as follows:

"23 August 1977

"Marjorie Swanson
"Rt 2, Box 556
"Libby MT 59923

"Dear Marj:

"This is to confirm our telephone conversation
of August 23, 1977 wherein I informed you that St.
John's Lutheran Hospital will continue to pay your
salary for two weeks until September 6, 1977 at
the usual rate.

"I sincerely regret having to terminate your
services. However, your untimely refusal to
perform customary and needed services puts me
in a position where I have few viable alternatives.

"I wish you the very best in all future
endeavors and I will pray that God leads you in
a direction in which you can perform satisfactorily
and grow as an individual within the limits of
your conscience.

-5-

"Sincerely,


"Dan Wigart"

No request was made by the hospital, nor by the person desiring sterilization, that Marjorie Swanson state in writing her grounds for refusal.  At the trial, when asked upon what basis she did not wish to participate in the tubal ligation, she replied, "on moral and religious grounds".

After her discharge, appellant was paid by the hospital from August 23, 1977 through September 6, 1977 representing two weeks pay.

On Wednesday, August 24, 1977, Wigart, in his office, told Nurse Marlys Mongan, an employee of the hospital, that the dismissal of Marjorie Swanson was upsetting to him "because in the last three months he thought Marge had really come along as being a good team member".

On Wednesday evening, August 24, 1977, at a nurses meeting, Wigart said, "Marge had refused to give anesthetic for a tubal ligation that was scheduled on Tuesday morning and that he had no alternative but to give her two weeks notice."  He stated no other reasons for her dismissal.

In a subsequent conversation with Rev. Strom, either on Thursday, August 25 or /September 1, 1977, Wigart indicated his feelings toward the state law concerning sterilization. Rev. Strom testified:

> "During those two conversations Dan
> Wigart first advised me about his
> experience in California.  His experience
> with a union and then went into the
> idea that he changed his mind about the
> going for the union doings, and that

-6-

he now was very conservative and certainly was not union minded. And he saw the state law in the same category, and that it was his job to not let unions or state laws interfere with the operation of the hospital."

Marjorie Swanson filed her complaint against the hospital on September 13, 1977, alleging that she had been discharged because of her refusal to participate in the sterilization procedure. Defendant filed its answer on November 22, 1977, and trial was had before the court, sitting without a jury on February 15, 1978. On April 5, 1978, the court entered its findings of fact and conclusions of law ruling against plaintiff Swanson. On April 11, 1978, Swanson moved to amend the findings of fact and conclusions of law and judgment or in the alternative for a new trial and these motions were denied on April 13, 1978. Timely notice of appeal was filed on April 17, 1978.

Swanson presents four issues for review:

1. The District Court finding that Swanson was an "employee of questionable value" is irrelevant and against the evidence.

2. The District Court erred in concluding that Swanson, having participated in sterilization procedures in the past was precluded from refusing to participate on August 22, 1977.

3. The District Court erred in concluding that Swanson's rights under the conscience statute are outweighed by her employer's necessities, and her inability to maintain herself as an effective employee.

4. The District Court erred in holding that Swanson was required to cite her reasons for nonparticipation of the sterilization procedure at the time of her refusal.

-7-

THE ISSUE THAT SWANSON WAS "AN EMPLOYEE OF QUESTIONABLE VALUE"

In its finding no. 5, the District Court found that Swanson was an employee of "questionable value" to the hospital for several reasons, including (a) when Swanson did not get the raise she expected, she did not talk to the administrator "for a day" and informed the administrator that he could find another anesthetist; (b) that Swanson abrasively handled a situation involving blood supplied from the hospital laboratory outside of the scope of her duties, causing disharmony; (c) Swanson argued about proceeding with a tonsillectomy procedure in such a manner as to upset the physician and cause disharmony; (d) it was constantly necessary for the administrator to assure Swanson that she was a "team member" capable of holding up her end of the hospital work; (e) the hospital had difficulty with Swanson because she made excessive demands, had difficulties with other employees, failed to recognize authority, refused to stay with patients recovering from anesthesia and maintained outdated drugs; and (f) in order to effectively operate a hospital, it is necessary that harmony prevail and that the staff act as a team and that Swanson did not so act.

All of the foregoing reasons utilized by the District Court to determine that Marjorie Swanson was an employee of questionable value were irrelevant, because they were outside of or not included in the August 23, 1977 letter of Wigart to Swanson stating the reasons for her discharge. The letter had been delivered in accordance with the demand of the discharged employee. Under section 41-1311, R.C.M. 1947, now section 39-2-801 MCA, upon such demand, the employer must furnish to the discharged employee a "full, succinct and

-8-

complete reason of discharge". The letter of August 23,
1977 was the employer's compliance with that statute. The
writing required of the employer by former section 41-1311
is known as a "service letter" (51 C.J.S. Labor Relations,
§15, p. 588). A statute such as former section 41-1311
becomes a part of any employment contract entered into by an
employer and an employee in the State of Montana. Brinks
Inc. v. Hoyt (8th Cir. 1950), 179 F.2d 355, 358. The
wording of such service letter statutes varies from state to
state, but generally it is held that such a statute requires
valid, clear and true reasons for the discharge, or a statement
of the "real, honest and factual" reasons. Cumby v. Farmland
Industries, Inc. (Mo.App. 1975), 524 S.W.2d 132, 135.
Where, as in Montana, the purpose of the statute is to
prevent "blacklisting", it is our duty to interpret former
section 41-1311 requiring a "full, succinct and complete"
statement to mean exactly what it says. Therefore, in the
case at bar, the only reason which could be considered by
the District Court was the reason set forth in the letter of
August 23, 1977, her "untimely refusal to perform customary
and needed services." The other reasons found by the District
Court that made the employee one of questionable value were
irrelevant because those reasons were not contained in the
August 23, 1977 letter defining the reasons for her discharge.

Moreover, the finding by the District Court of other
reasons for her discharge not set out in such letter are not
supported by the evidence. The finding that Marjorie Swanson
did not get the raise she expected in April 1977, that she did
not talk to the administrator and that she informed him he

could find another anesthetist, is based on evidence to
which an objection was sustained by the District Court
during the trial. It is not a part of the record.

The clear weight of the evidence relating to the
situation involving blood from the laboratory is on
Marjorie Swanson's side. The attending physician, in a
surgical procedure, had ordered whole blood and instead,
the laboratory sent packed cells. Because she objected
that the laboratory was not following the physician's
orders, eventually the laboratory began sending whole blood
as ordered. Her objection may have caused disharmony
with the laboratory, but she felt it was within her
professional competence to alert the staff about the
problem. She is not to be blamed for alerting the
hospital to a disregard of the doctor's orders.

The finding relating to the tonsillectomy procedure
is again not based on the evidence. In this case, the
patient had an elevated temperature and as an anesthetist,
she refused to be responsible for administering anesthetic
to a patient in that condition. This was completely
within her competence. When she refused to go along with
that procedure unless the hospital would accept the
responsibility, the administrator of the hospital
refused to accept it, under the undisputed evidence.

Moreover, these incidents all occurred in October
or November 1976, except for her pay raise dispute which
occurred in April 1977.

As to the general findings of the court that Marjorie
Swanson made excessive demands, had difficulties with

other employees, failed to recognize authority, refused to stay with patients recovering from anesthia, and maintained outdated drugs, none of these are supported by the evidence. Her only demands related to her wage negotiation; the only employee of the hospital appearing to testify, testified in her favor; Swanson recognized the authority of the administrator and of the doctors by becoming a good team member; and the questions with respect to patients recovering from anesthia and maintaining outdated drugs were refuted by her. No other evidence was produced of any kind by the hospital to indicate that answers to the line of questioning addressed to her on those points were otherwise than what she answered.

Finally, the finding that Marjorie Swanson was not a good "team member" is against the clear weight of the evidence. Marjorie Swanson testified that Dan Wigart had told her that she was a good employee, and a good team member; on the day of her firing, Dan Wigart told Rev. Strom, concerning her job performance, that during the past few months she had done a fine job and that they had no complaints, and that she was becoming a good team member. Marlys Mongan, a fellow employee, testified Dan Wigart had told her that in the last three months he thought that Marge had really come along as a good team member. But the most telling evidence is the testimony of the administrator himself who said:

> "Q. During the summer of 1977, say from May, 1977, until the time of Marge Swanson's discharge, did you tell Marge Swanson that she was really a member of the team?
>
> "A. Yes, I did.
>
> "Q. Did you tell her this on more than one occasion?

-11-

"A. Yes, I did.

"Q. During the summer of 1977, did you ever tell Marge Swanson that she was a good employee?

"A. Yes, I did.

"Q. Did you tell Marge Swanson that she was a good employee on more than one occasion?

"A. Yes.

"Q. During the summer of 1977, did you ever tell Marge Swanson that she was doing good work?

"A. Yes, I did."

When viewed against the state of the record, the finding that Marjorie Swanson was not a good "team member" cannot stand.

Finally, however, the findings of the District Court citing other reasons for her discharge cannot stand in the face of the overwhelming evidence that the single and only reason for her discharge was her refusal to participate in a tubal ligation. In addition to all of the events and actions by the administrator surrounding plaintiff's discharge that we have set forth above in stating the facts of this case, there is the testimony of the administrator that had she participated in the sterilization procedure, she would not have been discharged. Therefore, regardless of any other reasons that may have existed for her discharge, and had they existed, it is nevertheless true that she was discharged on August 23, 1977, for her refusal to participate in a tubal ligation, a sterilization procedure. Her discharge constitutes a violation of former section 69-5223.

Another factor in this connection is that in April 1977 the contract of employment of Marjorie Swanson was renewed.

-12-

The renewal took place after the events which are now claimed as reasons for her dismissal. Not only was her contract renewed, but she was given a substantial raise of $1,000 (true, she had demanded more). Her renewal in that manner, without warning of the necessity of improvement, or any indication of dissatisfaction with her past services, shows that there is little substance to the now claimed reasons for her discharge.

Where there is no substantial basis for District Court findings and if a clear and satisfactory showing is not made to support the findings, this Court will set such findings aside. Magelssen v. Mouat (1975), 167 Mont. 374, 538 P.2d 1015, 1019; Kasala v. Kalispell Pee Wee Baseball League (1968), 151 Mont. 109, 439 P.2d 65, Judson v. Anderson (1945), 118 Mont. 106, 165 P.2d 198.

Both parties cite the United States Supreme Court case of Mt. Healthy City School District Board of Education v. Doyle (1977), 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471, in support of their positions. Our examination of this case leads us to the conclusion that it bolsters Marjorie Swanson's case. In Mt. Healthy, Doyle an untenured teacher, had previously been involved in an altercation with another teacher and in arguments with cafeteria employees, swearing incidents with students, the making of obscene gestures, and had conveyed through a telephone call to a local radio station, the substance of a new school rule relating to the dress code of teachers. Thereafter, adopting a recommendation from the superintendent, the School Board advised respondent that he would not be rehired, citing his lack of tact in handling professional matters with specific mention of the radio station and the obscene

-13-

gesture incident. Doyle brought an action against the School Board for reinstatement or damages claiming that the refusal to rehire him violated his rights under the First and Fourth Amendments. The Federal District Court found that the telephone call was clearly protected under the First Amendment and that because it played a substantial part in the School Board's decision not to rehire Doyle, Doyle was entitled to reinstatement with back pay. The District Court was affirmed by the court of appeals, Doyle v. Mt. Healthy City School District Board of Education (1975), 529 F.2d 524. The United States Supreme Court vacated the decision and remanded the case upon the ground that the constitutionally-protected conduct may not have played a substantial part in the decision not to rehire the teacher and amounted to a constitutional violation justifying remedial action. The Supreme Court required that the District Court should go on to determine whether the Board of Education had shown by a preponderance of the evidence that it would have reached the same decision even in the absence of protected conduct of the teacher. 429 U.S. at 287.

Applying the rationale of the Mt. Healthy decision to the case at bar, it is clear from the testimony of the administrator, Dan Wigart, that Marjorie Swanson would not have been discharged in the absence of her refusal to participate in tubal ligations, which is protected conduct under former section 69-5223. There is no question in this case that the claimed reasons found by the District Court were not sufficient in August 1977 to bring about her discharge, as far as the employer was concerned; there is also no question that her refusal to participate in the sterilization did bring about her discharge. As a matter of fact, under the rationale of Mt. Healthy, once Marjorie Swanson established that her discharge was brought about in

-14-

substantial part by her refusal to participate in the sterilization, it then became the burden of the hospital to prove by a preponderance of the evidence that it would have discharged her without the exercise of her protected conduct. The hospital did not meet this burden under the state of the record.

SWANSON'S PARTICIPATION IN PAST STERILIZATIONS

The second issue we discuss is whether Marjorie Swanson is precluded from refusing to participate in sterilization procedures by reason of her past participation in such procedures. The hospital argues that because she had participated in the past, her refusal on August 22, 1977 to participate further demonstrated she had "flexible" religious principles and scruples. Because we are interpreting this statute for the first time and as far as we can determine, no other court has interpreted such a statute, we have no guidelines by way of legal precedent on this argument. Former section 69-5223 makes no differentiation with respect to the right of refusal and it is "unlawful to interfere or attempt to interfere with the right of the refusal authorized" by the section. Given the propensity of the human conscience to define its own boundaries and the fact that such boundaries might be widened or limited by experience, it seems natural that a person's concept of the propriety or morality of a procedure or situation might change from time to time. The right given by the statute is unqualified, irrespective of past participation.

WHETHER THE RIGHT TO REFUSE IS OUTWEIGHED BY OTHER CONSIDERATIONS

-15-

The third issue that we address relates to the conclusions of law adopted by the District Court. In both of these conclusions, the District Court determined that Swanson's right to refuse to participate in sterilization was "outweighed" by considerations outside the scope of her conscience.

The first conclusion of the District Court was that the right of refusal to participate in sterilization was "far outweighed" by the rights of the hospital under the circumstances of this case to maintain its standards as an effective employer and operator of the only hospital in an isolated geographic area. The District Court bases this conclusion upon its findings that substitute nurse-anesthetists available to replace Swanson must be procured from Bonners Ferry, Idaho, a 55 mile distance or Kalispell, Montana, a 90 mile distance; that such substitutes are employed at other hospitals and available only when their schedules do not conflict; that continual arrangements for substitutes are unacceptable to the hospital because of traveling and scheduling difficulties; that uncertainty results in the hospital as to when a sterilization procedure might be accomplished, that are detrimental to patients; and that the cost of substitutes is greater, and is an additional burden to the hospital and to the hospital patients.

By so concluding, the District Court reads into former section 69-5223 provisos that the legislature itself did not see fit to include. Instead, the legislature said, "All persons shall have the right to refuse . . . to participate in sterilization . . ." The statutory right is unqualified, and it may not be qualified or limited by the District Court on other considerations.

-16-

It is noteworthy that the hospital does not attack the validity or constitutionality of section 69-5223. By accepting the statute as constitutional, the hospital must accept the statute in the way it is written, which in this case means it applies to "all persons" irrespective of their geographic location and the discomfitures that might result from the exercise of the statutory right.

Secondly, the District Court concludes that the right of Swanson under the conscience statute is "far outweighed" by her inability to maintain herself as an effective employee of the defendant. We assume this means that by exercising her right of refusal, the employment duties that Marjorie Swanson would ordinarily perform in the operating room must be handled by someone else in sterilizations and therefore she is not an "effective employee". Again, former section 69-5223 admits of no such limitation or qualification, nor may the statutory rights of Marjorie Swanson be so weighed because to do so would emasculate her statutory rights.

WHETHER EMPLOYEE MUST CITE MORAL OR RELIGIOUS BELIEFS AT THE TIME OF REFUSAL

The fourth issue relates to the finding of the District Court that on August 22, 1977, when Marjorie Swanson informed the admini/strator that she would not participate in the tubal ligation, she "did not cite moral or religious beliefs as controlling her at that time". Aside from the overwhelming evidence that all parties knew at the time why she was refusing to participate, the finding is irrelevant. Under former section 69-5223, she was not required to state her reasons unless "requested by [the] hospital". No such request occurred here. Moreover, if requested, under the statute

-17-

she could refer generally "to the grounds of religious beliefs and moral convictions". She did this the only time she was asked, during the trial before the District Court. Even upon request, under the statute, she is not required to state the precise commandment, dogma, or tenet that leads to her refusal. The intent of the legislature in so providing is manifest: a person's conscience about sterilization need not be related to any particular religion, cult, or sect, but may be a part of the person's indefinable concept of the natural law, not easily explained in an A-B-C fashion.

In like manner, the finding of the Court that neither party may have been aware of the existence of the statute at the time is also irrelevant. If "ignorance of the law is no excuse", neither is it an escape hatch.

UNTIMELINESS OF THE REFUSAL

There is but one remaining factor to discuss with respect to her refusal, that is whether the exercise of that refusal by her was untimely. This is a legitimate issue to examine because it is a ground within the Wigart letter of August 23, 1977, giving the hospital's reason for her discharge. The District Court made no finding or conclusion regarding this factor, except to note that the tubal ligation had been scheduled by a member of the medical staff on August 10, 1977 for 8:00 a.m. on August 23, 1977 and that on August 22, 1977 at approximately 10:00 a.m. Marjorie Swanson informed the hospital's Wigart of her refusal.

Upon being so informed, the hospital administrator did not immediately begin to seek a nurse-anesthetist substitute, although he admits that when he was first informed, he found in her a "sense of finality". Instead he hoped to talk

-18-

her out of it, apparently, by convincing her that she was not "participating" in the sterilization if she did not wield the instrument. Because of _his_ requested delay in her decision, she did not finally inform him until approximately 7:00 p.m. In spite of this, however, he was able to obtain the services of a nurse-anesthetist from Bonners Ferry, and the surgery went on as scheduled.

Thus, there was no evidence in the record which would support a finding of untimeliness. Sterilization is an elective procedure, at least in this case. There is no showing in the evidence that the hospital was unduly prejudiced, nor the patient was endangered. The attending doctor testified over objection that in his opinion such notice of refusal would not be timely _unless given at the commencement of the employment_. This obviously must be rejected because it would lead to the very recrimination that former section 69-5223 was established to prevent. In light of the record therefore, we have no occasion here for us to determine whether in a proper case an untimely notice might outweigh the statutory right of a person to refuse to participate in a sterilization procedure.

### CONCLUSION AND DISPOSITION

We find therefore, that Marjorie Swanson, having a statutory right to do so, validly refused to participate in the sterilization procedure. Having done so, she was entitled to the further protection of the statute that her refusal should not be a consideration in respect to staff privileges nor a basis for any discriminatory, disciplinary or other recriminatory action against her. Her firing because of her refusal is exactly the kind of recrimination that is countermanded by the conscience statute.

-19-

She would be entitled to reinstatement to her position provided that the term of her employment contract would have continued to the present time. However, it was Marjorie Swanson's contention that her employment by the hospital was for a period of one year, from April 1977 through April 1978. Since that time has passed, we cannot order that she be reinstated to her position.

Under section 50-5-504(2) MCA, she is entitled "to monetary damages for injuries suffered". It is the function of the District Court to determine the amount of and kind of monetary damages to which she is entitled.

Reversed and remanded to the District Court with instructions to undertake such further proceedings as are necessary to enter a judgment in favor of Marjorie Swanson and to determine the damages she has sustained.

_John L. Shehy_
Justice

We Concur:

_Jni S Daly_

_Daniel J. Shea_
Justices

Mr. Justice John Conway Harrison dissenting:

For purposes of this dissent, I will discuss the issues in the order presented by appellant.

I do not quarrel with plaintiff's assertion that, under Montana law, all persons have the right to refuse to participate in a sterilization because of religious beliefs or moral convictions. However, section 69-5223(2) and (3), R.C.M. 1947, now section 50-5-504 and -505 MCA, is invokable only if one's refusal to participate is, in the statutory language, "because of religious beliefs or moral convictions." Here, there are a number of inconsistencies in plaintiff's position.

While it is true that one need not hold religious beliefs or moral convictions for a specified period of time before enjoying the protection of the statute, in these circumstances reliance on the statute strikes a discordant note. For the six years prior to her termination, plaintiff participated in 20 sterilizations without objection, including six such operations in the year prior to these events. Also, being greatly upset, as plaintiff testified she was by the August 19 operation, is a physical and emotional reaction, but not a religious belief or a moral conviction. Assuming _arguendo_, that a plaintiff's refusal to participate is grounded in religious beliefs or moral convictions, plaintiff testified at the hearing so as to belie that assumption. She testified that she does not have any objection to administering anesthesia for an ordinary D&C.

This merits some elaboration in light of plaintiff's attempt to discount her own testimony in this regard. Her testimony was that she would have no objection to administering anesthesia for an ordinary D&C. In her reply

-21-

brief, she accuses respondent of "misunderstanding" the nature and uses of a D&C and states that the use of a D&C for a therapeutic abortion is "relatively minor" compared to other ordinary uses of D&C.

Respondent hospital asserts that a D&C, as performed at that hospital, is a therapeutic abortion. Plaintiff had given the anesthetic in other D&C's which apparently were therapeutic abortions and which she, as a medical practitioner, understood to be just that.

Plaintiff testified she would not object to giving the anesthetic for an ordinary D&C, which certainly may be therapeutic abortion. If she were upset by the D&C, then her refusal to participate in any more D&C's would be understandable; but that apparently is not her position.

Another baffling inconsistency is plaintiff's refusal to participate in one surgical procedure, sterilization, based on experience with a totally different surgical procedure, dilation and curettage. It would be logically consistent for plaintiff to refuse to participate in other D&C's, but her refusal to participate in a totally different surgical procedure makes as much sense as saying, "Because I had a bad experience with a tonsilectomy, I will not do any more appendectomies."

Plaintiff responds that one need not hold his beliefs or convictions for a particular period of time before realizing the protection of the statute, and that one need not be aware of the existence of the statute to enjoy its protection. Both contentions are true, but they do not meet the prior problem--was she relying on the statute at the time of these events, or is the reliance an after-the-fact means to getting reinstated?

Plaintiff's second argument is improperly advanced. Respondent does not contest the constitutionality of the statute in question, and the issue was not properly preserved in the lower court proceedings.

To deal with the third and fourth arguments, a recitation of certain of the testimony presented during the hearing is necessary. The District Court determined that "Plaintiff had been an employee of questionable value to Defendant", offering the following reasons in support of its conclusion. Reference was made to an incident during which plaintiff, who negotiated her own salary with the hospital administrator, would not talk with him for "some period of time" (actually, one day) after being refused the substantial raise she had requested. In another episode, plaintiff questioned a delivery made by the hospital laboratory personnel. In that incident, plaintiff became embroiled in an argument with one of the lab personnel. Another incident to which the District Court alludes is that in which plaintiff refused to administer anesthetics for a tonsilectomy when the patient had an elevated temperature. Plaintiff registered her complaint with Wigart, the hospital administrator, who concurred in her decision, testifying that "in that particular instance the safest approach was the best."

The District Court also found that "it was constantly necessary for the administrator to assure Plaintiff she, indeed, was a 'team member' capable of holding up her end of the hospital work." The testimony on this point is conflicting. Plaintiff testified that the hospital administrator told her she was doing a good job and that she was a good team member, particularly during the three months before her termination. The hospital administrator cor-

roborated that testimony. His version, however, included an explanation that he did so to give positive reinforcement to the plaintiff, whom he believed was not working as well as he said she was. His explanation was to the effect that he was using "this team concept positive enforcement with her to overcome [certain] difficulties" she was having at the hospital. He acknowledges that he told plaintiff a number of times that she was a good employee and a good team member and does not claim that he offered criticism of her work in conjunction with the praise. It seems fair, therefore, that she could take that praise at face value. After the fact, however, Wigart in effect claims that he was just saying that to encourage plaintiff's performance to come in line with the praise which she was given, apparently prematurely.

As part of the rationale for the same finding of fact, the District Court determined that "the difficulties of Plaintiff's relationship with Defendant can be characterized as making excessive demands, difficulties with other employees, failure to recognize authority, refusal to stay with patients recovering from anesthesia and maintaining outdated drugs." Making excessive demands refers to the incident in which plaintiff requested an inordinately high pay raise. Difficulties with other employees apparently refers to her refusal to administer an anesthetic in the tonsilectomy referred to above and in another operation in which the patient had a slow pulse. The failure to recognize authority seemingly refers to the incident in which the laboratory did not deliver the blood which the doctor had ordered. A refusal to stay with patients recovering from anesthesia refers apparently to plaintiff's questioning of

the hospital procedure whereby one other than a qualified medical practitioner, a registered nurse, for example, would stay with patients recovering from surgery. The reference to maintaining out-dated drugs is puzzling, as the record is devoid of any reference to this.

The District Court determined that plaintiff's refusal to participate in the sterilization scheduled for August 23, 1977, described by Wigart as "the straw that broke the camel's back," was "only the last of many problems involving Plaintiff, and while it was the incident which gave rise to this controversy, it was not the primary moving cause of discharge." This finding invites discussion of the legal principles articulated by the United States Supreme Court in Mt. Healthy City Board of Ed. v. Doyle (1977), 429 U.S. 274, 97 S.Ct. 568, 50 L Ed 2d 471.

Although Mt. Healthy involved a controversy surrounding the refusal to rehire an untenured teacher, the test articulated there is applicable to the instant case. The test is designed to be applied in those circumstances in which an employee, who has not been rehired or in practical effect discharged, claims that his discharge was unlawful because the conduct which precipitated it was constitutionally protected. The issue on which the Court focused is whether, even if it were the case that the employer legally could have dismissed the employee had the one precipitating incident never come to its attention, "the fact that the protected conduct played a 'substantial part' in the actual decision [to terminate] would necessarily amount to a constitutional violation justifying remedial action." 429 U.S. at 285. The Court concluded that it would not. The rationale was:

"A rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. . . A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision." 429 U.S. at 285-86.

After announcing in passing that an employer would not be precluded from attempting to prove that quite apart from the protected conduct, the employee's record was such that he would not have been rehired in any event, 429 U.S. at 286, the Court announced a test, "one which likewise protects against the invasion of constitutional rights without commanding undesirable consequences not necessary to the assurance of those rights." 429 U.S. at 287. The burden initially is placed upon the complaining employee to show that his conduct was protected and that the conduct was a "substantial factor," or a "motivating factor," in the decision to terminate his employment. Once the employee carries this burden, however, it is incumbent upon the employer to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct. 429 U.S. at 287.

It appears, then, that if a plaintiff fails to prove both that his conduct was constitutionally (or as in this case, statutorily) protected and that such conduct was a motivating factor in the decision not to rehire (or as in this case, to terminate) the inquiry is then ended. The

burden would not shift, because it would not have been carried by the plaintiff in the first instance. Therefore, the first determination must be whether plaintiff's refusal to participate in the sterilization was in fact statutorily protected.

The second half of plaintiff's burden has been carried. It is clear by the admission of the hospital administrator himself that the refusal was a motivating factor in the decision to terminate plaintiff. Note, however, it was not the refusal per se which was as troublesome as the timing of the refusal. Plaintiff allowed less than 24 hours "lead time" for the hospital administrator to find an anesthetist who could substitute for her. That task was no easy one, given the geographical isolation and paucity of qualified practitioners in the Libby area. Because of fortunate circumstances, the operation did go ahead as scheduled, but that appeared to be a matter of sheer dumb-and-blind luck, rather than what reasonably could have been expected.

To return to that initial inquiry: did plaintiff prove that her conduct was constitutionally protected? Here again we must examine the inconsistencies in the plaintiff's position. She had participated in 20 sterilizations in the six years prior to her termination; six of those operations were performed within the last year of her tenure. Being greatly upset, as plaintiff assuredly was, is, as respondent characterized it, a physical and emotional reaction, but is not a religious belief or moral conviction. One might reasonably argue that the reaction would not have been forthcoming had it not been for a religious belief or moral conviction held by plaintiff, for however short a time. However, there is plaintiff's testimony during the hearing

that she would participate in ordinary D&C's, even though the operation which caused her stress was itself a D&C. There is also the logical leap which one must make in correlating a refusal to assist in a sterilization to an upsetting experience in a totally different surgical procedure, the therapeutic D&C. It is true that the District Court made no specific finding as to whether plaintiff's conduct was statutorily protected, but a fair inference from the findings as a whole and the conclusions drawn therefrom is that the court found it was not.

If it may be inferred that the District Court found plaintiff's conduct was not statutorily protected, then the determinations made with respect to the other reasons for plaintiff's termination are unnecessary and irrelevant, as plaintiff contends. But given that the employer has the right to put on proof demonstrating that the plaintiff was terminated for permissible reasons, then findings with respect to that evidence are appropriately made.

The other justifications for plaintiff's termination advanced by Wigart are somewhat tinny; they do not ring true. The reason which appears soundest is the one involved in this controversy--plaintiff's announcement of her intention not to participate within 24 hours of the scheduled operation. There is no doubt this was disruptive. The patient had been "prepped" and was physically and emotionally ready for the operation. Had plaintiff made her objections known on the 19th of August, giving the hospital administrator a longer and more reasonable period of time in which to secure a substitute, it would be an easy matter to conclude that her termination was unlawful. Given that she waited until the proverbial eleventh hour to announce her

-28-

intention not to participate, however, goes to strengthening respondent's case.

This, then, is that on which the decision turns. The District Court, with its superior advantage to observe the demeanor of the witnesses, concluded that the hospital had ample justification independent of this particular event for terminating plaintiff's employment. It implicitly found that plaintiff's conduct was not statutorily protected. It is axiomatic that, where there is a conflict in the evidence, this Court will defer to the findings of the trial court, which are presumed to be correct if supported by substantial credible evidence. In a nonjury trial, the findings of the District Court will not be reversed on appeal, unless there is a clear preponderance of evidence against those findings. See, e.g., Montana Farm Service Co. v. Marquart (1978), ____ Mont. ____, 578 P.2d 315, 35 St.Rep. 631, and cases cited therein.

This Court may consider only whether substantial credible evidence supports the findings of fact and conclusions of law made by the District Court. See, e.g., Kartes v. Kartes (1977), ____ Mont. ___, 573 P.2d 191. In this case I believe that it does and would affirm the judgment.

_____
                    Justice

Mr. Chief Justice Frank I. Haswell dissenting.

I concur in the foregoing dissent of Mr. Justice Harrison.

I would add that in my view, the real issue in this case is whether plaintiff's refusal to participate in the operation on "conscience" grounds was bona fide or sham. Although the District Court did not make an express finding on this issue, its findings implied the latter. Such implied finding is supported by substantial, though conflicting, evidence and warrants affirmance of the District Court judgment in my opinion.

_____
Chief Justice