No. 85-380

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

MILDRED FLANIGAN,

        Plaintiff and Respondent,

-vs-

PRUDENTIAL FEDERAL SAVINGS & LOAN
ASSOC., a federally chartered banking
corporation, and FRED OGOLIN,

        Defendants and Appellants.

---

APPEAL FROM: District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable Mark Sullivan, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        David J. Wing argued, Butte, Montana

    For Respondents:

        Poore, Roth & Robinson; Donald C. Robinson argued,
        Butte, Montana

---

Submitted: April 24, 1986

Decided: June 5, 1986

Filed: **JUN 5 - 1986**

---
Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Plaintiff brought this action in the First Judicial District Court to recover damages based upon wrongful termination from employment. The jury returned a verdict in favor of plaintiff, awarding her $94,170 in economic damages, $100,000 for emotional distress and exemplary damages in the amount of $1,300,000. Defendants appeal. We affirm.

Mildred Flanigan (respondent) was hired as a teller on January 28, 1952, by Prudential Federal Savings and Loan Association. She worked in various capacities until April 15, 1980, at which time Fred Ogolin, Vice President and Manager of Prudential Federal Savings and Loan, Butte Branch, fired her. Hereafter, the two defendants will be referred to jointly as the appellants unless it is necessary to distinguish them by specific reference.

The issues presented for review involve substantial credible evidence questions. We therefore will detail the facts and, as we must, in a light favorable to respondent. First National Bank in Libby v. Twombly (Mont. 1984), 689 P.2d 1226, 1230, 41 St.Rep. 1948, 1952; Jacques v. Montana National Guard (Mont. 1982), 199 Mont. 493, 503, 649 P.2d 1319, 1325.

Following commencement of her employment, respondent worked as a teller for approximately 14 years, performing in a satisfactory fashion. In 1966 she became branch office bookkeeper. That position was eliminated because of a change in technology and in 1973, the respondent moved into the mortgage loan department where she became branch general clerk. She maintained this position until 1976, when she became assistant loan counselor. Respondent performed satisfactorily in all positions.

2

On December 7, 1979, prior to respondent's termination, the president of Prudential prepared an interoffice memorandum entitled "Personnel Information and Policy Change". This memorandum was distributed to all employees formally advising them of economic turndowns and the resulting need of Prudential to reduce its work force. The memorandum was discussed at the staff meeting in Butte, Montana, on December 13, 1979. Respondent was present. In the latter part of January, 1980, respondent was advised by Fred Ogolin that her position as assistant loan counselor was to be terminated as of June 1, 1980. After discussion, Ogolin advised respondent of a teller training program in Salt Lake City, Utah, and asked her if she desired to broaden her job skills. Respondent accepted the offer and on March 2, 1980, she attended the week-long program. On March 18, 1980, after her return to Butte, respondent began working as a teller. Less than one month later, respondent was terminated without notice and without hearing. She was given six months pay as a severance benefit and paid her accumulated profit sharing benefits of $48,428.02. After respondent was terminated, she was offered, by letter dated June 9, 1981, a part-time position as teller. After consultation with counsel, the offer was rejected.

Within two weeks following her termination, respondent filed an age discrimination complaint with the Human Rights Commission. She received a "right to sue" letter and filed this complaint on April 13, 1983.

After consolidating several of appellants' issues, we find the following questions govern the outcome of this appeal:

3

1. Was there substantial credible evidence to support submission of respondent's case to the jury based upon breach of the implied covenant of good faith and fair dealing?

2. Did the District Court err in its treatment of the negligence issue? As sub-issues we determine whether it was error for the trial court to allow amendment of the pleadings; whether the negligence count was barred by the statute of limitations; whether comparative negligence was applicable; and whether workers' compensation was the exclusive remedy?

3. Did the District Court err in allowing opinion testimony from expert witnesses about the covenant of good faith and fair dealing?

4. Was it error to refuse admission of defendant's Exhibit U.U.?

5. Did the District Court err in failing to reduce damages by $26,290.53, the amount the plaintiff would have received had she not refused to accept the position as a part-time teller following her termination?

6. Was there substantial credible evidence to submit punitive damages to the jury? We include within this issue the question of whether punitive damages were excessive as a matter of law.

ISSUE ONE

Was there substantial credible evidence to support submission of respondent's case to the jury based upon breach of the implied covenant of good faith and fair dealing?

The principal argument advanced by appellants is that Prudential was experiencing severe economic conditions and terminated the respondent in a legitimate reduction-in-force move designed to curb costs. Appellants argue that a Montana jury should not be a silent partner in every decision made to

4

terminate employees. Reliance is placed upon the language of Professor Gary Murg and Clifford Scharman, in an article titled "Employment at Will: Do the Exceptions Overwhelm the Rule?" 23 Boston College L.R. 329, 372 (1982), wherein it was said:

> . . . A jury should not be entitled to second guess an employer's policy or practices to determine that they are insufficient justifications for a discharge. Such an approach would leave virtually all personnel practices open to communal comment. A personnel practice that is justifiable to one jury may be found pernicious to another. The likely result would then be to subject employers to the threat of suit in every instance of a discharge as the employee attempts to find a jury sympathetic to his cause. Thus, the only issue that should be posed to the jury is whether the personnel practice was applied equally to all employees. It is submitted that if an employer's promise of continued employment is to be given contractual force courts must limit the discretion of the jury in determining what constitutes good cause.

Respondent disputes that she was terminated as part of a reduction-in-force program. She points to the testimony of Ogolin, who fired her. Ogolin testified at trial that, but for the respondent's alleged poor performance as a teller, she would have remained employed by Prudential. In earlier testimony Ogolin had said that under no circumstances would the respondent have remained with the company.

Respondent argues that the dual and contradictory reasons for termination advanced at trial by the appellants reveal an arbitrary, capricious and bad faith firing. Respondent notes the following Ogolin testimony which is supportive of a reduction in force:

> Q. (By Mr. Robinson) . . . Would Mildred have been let go if in the three weeks she worked as a teller she had appeared to be performing as well as any other average teller in your operation?
>
> A. (By Mr. Ogolin) Yes. I had already made the decision that Mildred's job was going to be, or position was going to be eliminated . . . .

5

Q. So, how well she performed in that three-week period had nothing to do with your decision to terminate her on April 15, 1980, is that true?

A. That's correct. That decision was made before she performed as a teller trainee in the Butte office.

* * *

Q. So, you wouldn't have considered her for staying no matter how she had performed as a teller, good or bad, is that true?

A. That's right, yes.

Q. That would be true even if she had performed as well as Connie Selon who had worked as a teller for 4 years?

A. Yes, that's true.

(Tr. pp. 437-438) (Emphasis supplied.)

Several days later Ogolin, testifying in his own defense, gave this contradictory testimony:

Q. You put in a lot of testimony today about the fact that she didn't perform well according to your opinion but it's true, is it not, as you testified last week that it wouldn't have made any difference how she had performed, she still would have lost her job, isn't that true?

* * *

A. Yes, I testified to that. . . .

* * *

Q. Are you changing your testimony from last Wednesday?

A. I'm saying that the facts were not that.

Q. My question again one last time, if she had performed as well as another teller, could she have kept her job?

A. Yes.

Q. Oh. So, you have changed your testimony from last Wednesday, is that correct?

A. Yes.

(Tr. pp. 1058-1059) (Emphasis supplied.)

Additionally, respondent argues that the employer violated its own written policies regarding job security and

job rights by terminating the respondent without notice and without hearing. Further, respondent maintains that she was entitled to be recalled to fill vacant positions but that she was not recalled except insofar as she was offered a part-time teller position.

Respondent offered evidence that her discharge was motivated by vindictiveness on the part of Ogolin. Because of seniority, respondent had a superior right to vacation time, even before Ogolin. She testified that when she asked the reason for her termination, Ogolin stated that she was "not making it as a teller" and that she was "vindictive" because she had used her seniority to select her four weeks of vacation during the month of August.

The reason for discharge was disputed by Prudential. Several months later, Prudential's president informed respondent, for the first time, that she was discharged as part of a company wide reduction in force. The president stated that "seniority or past performance was not considered" in the decision to discharge.

Implicit throughout the respondent's case is the allegation that she was terminated because of her age and because of a desire on the part of the employer to cut costs associated with respondent's pension. Younger and less experienced employees, who had lower composite performance evaluations and who occupied positions respondent previously held, remained working after respondent's firing. Ogolin admitted that any errors respondent made as a teller were not sufficient to warrant discharge. Ogolin further admitted that respondent was never warned, reprimanded or counseled about her performance as a teller, all prerequisites to termination according to Prudential's own policies. Prudential supervisors admitted that 60 days to six months

7

were normally required before one could become proficient as a teller. The decision to discharge respondent, however, was made after respondent worked less than three weeks in the teller position.

A long-term employee has an expectation of continued employment provided that the employee's work performance is satisfactory. Dare v. Montana Petroleum Marketing Co. (Mont. 1984), 687 P.2d 1015, 1020, 41 St.Rep. 1735, 1740. Of course, this does not foreclose an employer from engaging in legitimate reductions in force necessary to maintain the economic vitality of the company. However, there is evidence in this record, from the lips of Ogolin himself, that respondent was fired for poor work performance. The jury could have relied upon this latter testimony and therefore concluded there was no reduction in force.

The standard for ascertaining whether factual issues exist in a wrongful discharge case were articulated by the majority opinion in Dare, supra. We there said:

> The record discloses remaining genuine issues of material fact regarding Dare's wrongful discharge claim. The parties relate widely divergent versions of Dare's work performance and reasons for her termination. It therefore remains for the trier of fact to resolve these issues, including the reason for Dare's termination and whether she was fired for cause. (Emphasis supplied.)

687 P.2d at 1019, 41 St.Rep. at 1739.

The cause referred to in Dare is different from the "good cause" applicable in determining the propriety of an employee's termination under a contract for a specified term. In Pugh v. See's Candies, Inc. (Cal.App. 1981), 116 Cal.App.3d 311, 171 Cal. Rptr. 917, the California Appeals Court for the First District, Division 1, noted the distinction as follows:

> By what standard that burden is to be measured will depend, in part, upon what conclusions the jury

8

draws as to the nature of the contract between the parties. The terms "just cause" and "good cause," "as used in a variety of contexts . . . have been found to be difficult to define with precision and to be largely relative in their connotation, depending upon the particular circumstances of each case." (R. J. Cardinal Co. v. Ritchie (1963) 218 Cal.App.2d 124, 144, 32 Cal.Rptr. 545.) Essentially, they connote "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power." (Id., at p. 145, 32 Cal.Rptr. 545.) Care must be taken, however, not to interfere with the legitimate exercise of managerial discretion. "Good cause" in this context is quite different from the standard applicable in determining the propriety of an employee's termination under a contract for a specified term. (Footnote omitted.)

116 Cal.App.3d at 330, 171 Cal.Rptr. at 927-928.

In Dare, supra, the heightened expectations resulting from long-term employment were the primary basis for reversing summary judgment in favor of the employer. Justice Weber, writing for the majority, said:

The presence of such facts [long-term employment] indicates that the term of employment has gone beyond the indefinite period contemplated in the at will employment statute, section 39-2-503, MCA, and is founded upon some more secure and objective basis. In such cases, the implied covenant protects the investment of the employee who in good faith accepts and maintains employment reasonably believing their job is secure so long as they perform their duties satisfactorily.

687 P.2d at 1020, 41 St.Rep. at 1740.

Closely allied with Justice Weber's reasoning in Dare is the California case of Cleary v. American Airlines, Inc. (Cal.App. 1980), 111 Cal.App.3d 443, 168 Cal.Rptr. 722, wherein the Second District Court of Appeal, Division 1, stated:

Two factors are of paramount importance in reaching our result that plaintiff has pleaded a viable cause of action. One is the longevity of service by plaintiff - 18 years of apparently satisfactory performance. Termination of employment without legal cause after such a period of time offends the implied-in-law covenant of good faith and fair dealing contained in all contracts, including employment contracts. As a result of this covenant, a duty arose on the part of the employer, American Airlines, to do nothing which would

deprive plaintiff, the employee, of the benefits of the employment bargain - benefits described in the complaint as having accrued during plaintiff's 18 years of employment.

111 Cal.App.3d at 455, 168 Cal.Rptr. at 729.

The covenant, in a long-term employment situation, only requires the employer to have a fair and honest reason for termination. An employee's incompetence or lack of loyalty certainly constitute sufficient reasons under this standard. However, as in this case, an employer may recognize by company policy an obligation to provide warnings and an opportunity for change. Respondent's evidence, if believed, proves that appellants failed to give respondent any opportunity to correct mistakes or otherwise conform her conduct.

Appellants' motivation for the termination was rendered suspect by Ogolin's inconsistent testimony on the witness stand. The jury may well have chosen not to believe appellants' whole case, in light of Ogolin's lack of credibility.

Respondent's 28 years of employment by Prudential gave her a secure and objective basis for believing that, if her work was satisfactorily performed, her employment would continue. From the evidence presented, the jury could have found that appellants had no fair and honest cause for discharge and, in fact, had ulterior motives. A case for jury deliberation was presented on the issue of wrongful termination.

ISSUE TWO

Did the District Court err in its treatment of the negligence issue? As sub-issues we determine whether it was error for the trial court to allow amendment of the pleadings; whether the negligence count was barred by the

10

statute of limitations; whether comparative negligence was applicable; and whether workers' compensation was the exclusive remedy?

Appellants argue that the negligence count was added five years after termination and was thus barred by the three year statute of limitations. This argument was recently disposed of in Sooy v. Petrolane Steel Gas, Inc. (Mont. 1985), 708 P.2d 1014, 1017, 42 St.Rep. 1702, 1705-1706. A complaint can be amended to include a new theory of recovery where the basis for the new claim is the same occurrence involved in the old claims. In this case, respondent argues that the negligence claim and the claim for breach of implied covenant of good faith and fair dealing arise out of the same occurrence, include the same facts and only involve different legal theories. We agree. The amendment was proper.

Negligence has been recognized by this Court to be a proper basis for recovery in wrongful termination cases. Negligence was approved by this Court in Crenshaw v. Bozeman Deaconess Hospital (Mont. 1984), 693 P.2d 487, 493, 41 St.Rep. 2251, 2259, wherein we said:

> The allegation of negligence was clearly established in respondent's complaint. We hold the trial court committed no error in issuing the instruction to the jury.

In Crenshaw, this Court relied upon the fact that plaintiff's expert on personnel management testified that the discharge was made without a proper investigation by the hospital administrator. Likewise, in this case, expert testimony revealed that appellants committed 13 different violations of Prudential firing policies. We find the precedent of Crenshaw compelling and hold the negligence theory was proper.

Appellants argue that workers' compensation is the exclusive remedy for negligence. However, appellants cite no authority for the argument that there is a workers' compensation remedy available for wrongful termination in employment. In fact, the tort of wrongful termination does not occur until the employment is terminated. The plaintiff could hardly be injured in the course and scope of employment by a tort that occurred subsequent to the existence of the employment itself.

Finally, appellants contend that they were entitled to an instruction on comparative negligence. Again, no authority is cited to support this proposition. Ordinarily, comparative negligence must relate to the same occurrences which are the subject of the negligence alleged against defendant. Blair v. Eblen (Ky. 1970), 461 S.W.2d 370; Ferrara v. Leventhal (N.Y.App.Div. 1977), 56 A.D.2d 490, 392 N.Y.S.2d 920. The negligence relied upon in the case before us involves negligent failure to review prior performance and work history. Appellants do not contend that respondent violated any duty in this regard. Any negligence of respondent during the course of employment, such as work mistakes, would go to the question of whether there was a reasonable basis for the firing. That question was submitted to the jury.

In awarding punitive damages the jury found appellants' conduct to be "willful". Even if the trial court should have submitted respondent's negligence to the jury, any error in that regard would be harmless. Negligence is not a defense to willful conduct. Simonson v. White (Mont. 1986), 713 P.2d 983, 987-988, 43 St.Rep. 133, 139.

12

ISSUE THREE

Did the District Court err in allowing opinion testimony from expert witnesses about the covenant of good faith and fair dealing?

Appellants claim error in the District Court's admission of opinion testimony from expert witnesses about the covenant of good faith and fair dealing. Again, this issue was resolved in Crenshaw v. Bozeman Deaconess Hospital, supra. The rationale for our holding in Crenshaw was stated by Justice Harrison:

> The instant case is not a scenario of simple facts. Fault arising from breach of implied covenant of good faith and fair dealing is not easily comprehensible to the average person. [The expert's] testimony was based on professional expertise and experience which the individual jury members were unlikely to possess. Her testimony assisted the trier of fact by providing the jury with information and a prospective (sic) beyond the common experience of a lay juror. (Citations omitted.)

693 P.2d at 494, 41 St.Rep. at 2260.

As noted previously, the experts who testified on behalf of respondent found 13 different violations of Prudential policies and personnel practices. Appellants complains that one expert was permitted to evaluate whether Prudential followed its policy as established in one of Prudential's own memoranda. However, appellants failed to object at time of trial. It is fundamental that a party may not raise, for the first time on appeal, alleged errors pertaining to the introduction of evidence or testimony that was not objected to at the time of trial. Scofield v. Estate of Wood (Mont. 1984), 683 P.2d 1300, 1302, 41 St.Rep. 1212, 1214-1215.

In Crenshaw, supra, this Court approved expert testimony interpreting written employment policies. We said:

> The trier of fact's experience does not extend to Hospital disciplinary guidelines, much less the ability to evaluate the propriety of such

13

> guidelines. . . . The trial court in its broad
> discretion admitted the expert testimony. The
> trial court's order will not be disturbed on appeal
> in the absence of a clear showing of a manifest
> abuse of discretion. (Citations omitted.)

693 P.2d at 495, 41 St.Rep. at 2261-2262.

Pursuant to the precedent established by Crenshaw, supra, respondent was justified in utilizing expert testimony. In permitting the expert witnesses to interpret employment policies, the trial court acted within its discretion.

ISSUE FOUR

Was it error to refuse admission of defendant's Exhibit U.U.?

Appellants contend that the trial court erred in refusing to admit a summary of teller transactions performed by various tellers during the few days that respondent worked as a teller prior to her termination. The exhibit was objected to and the objection was sustained on the grounds that it was a compilation of after-acquired evidence regarding respondent's performance; that the information was not known to appellants at the time of termination; and that Ogolin had not examined the compilations for the purpose of making a decision about firing respondent. Therefore, the after acquired-evidence could not be used to support termination at time of trial. See Swanson v. St. John's Lutheran Hospital (1979), 182 Mont. 414, 422, 597 P.2d 702, 706-707. The trial court ruling was correct. In any event, Ogolin was allowed to testify as to the essence of the information contained in the exhibit. Any error on the part of the trial court in refusing the exhibit was harmless in light of Ogolin's testimony.

14

ISSUE FIVE

Did the District Court err in failing to reduce damages by $26,290.53, the amount the plaintiff would have received had she not refused to accept the position as a part-time teller following her termination?

Appellants contend that respondent's award for loss of wages, that sum being $94,170, should have been reduced by the trial court in the amount of $26,290.53, based on respondent's alleged failure to mitigate damages by accepting Prudential's offer of part-time employment.

There was abundant evidence that the respondent sought to mitigate her damages by seeking other employment. However, the law does not require respondent to mitigate damages by accepting inferior employment from her former employer. The rule was stated by the California Supreme Court in Parker v. Twentieth Century-Fox Film Corp. (Cal. 1970), 474 P.2d 689, wherein the court said:

> [B]efore projected earnings from other employment opportunities not sought or accepted by the discharged employee can be applied in mitigation, the employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages. (Emphasis supplied.) (Citations omitted.)

474 P.2d at 692.

Appellants requested, and were given, a complete and accurate mitigation instruction. The instruction reflected the case law, above cited, stating that a wrongfully terminated person has a duty to reasonably seek and maintain other employment, but no duty to accept inferior employment. We find the trial court did not err in its handling of this issue.

15

ISSUE SIX

Was there substantial credible evidence to submit punitive damages to the jury? We include within this issue the question of whether punitive damages were excessive as a matter of law.

We have detailed the evidence presented by respondent in support of her claim for breach of implied covenant of good faith and fair dealing. That evidence need not be restated here. In addition to the evidence previously set forth, testimony from appellants' president revealed a calloused attitude toward older employees. Prudential's Donovan referred to older employees as "dead wood", "old dead wood", and "ballast". He reiterated at time of trial that he considered Mildred Flanigan to be "ballast".

The jury could have inferred malice from the lack of candor on the part of appellants. Appellants' position at time of trial was that respondent was terminated for inadequate performance yet, 14 months later, appellants offered respondent a part-time job. Further, Ogolin first testified that respondent was terminated because of a reduction in force and then later testified that she was terminated because of inadequate work performance. The jury may have chosen to believe she was terminated because of Ogolin's resentment stemming from respondent depriving him of the choicest vacation times.

Appellants argue that they had no notice that their conduct would be subject to punitive damages. However, the punitive damage statute, § 27-1-221, MCA, was in effect at the time appellants committed the subject acts. Appellants were fully apprised that malicious or oppressive conduct on their part could lead to the imposition of punitive damages. Our decisions in First National Bank in Libby v. Twombly

16

(Mont. 1984), 689 P.2d 1226, 41 St.Rep. 1948, and Tribby v. Northwestern Bank of Great Falls (Mont. 1985), 704 P.2d 409, 42 St.Rep. 1133, support this result.

Appellants complain that the punitive damages are excessive and based upon passion or prejudice. Section 25-11-102(5), MCA, provides that a verdict or a decision may be vacated and a new trial granted "on the application of the party aggrieved for . . . excessive damages appearing to have been given under the influence of passion or prejudice."

Appellants failed to raise the issue of excessiveness in post-trial motions. This Court need not now consider that contention on appeal. In Mitchell v. Thomas (1932), 91 Mont. 370, 8 P.2d 639, defendant claimed damages were excessive, showing passion and prejudice on the part of the jury. The Supreme Court stated:

> A motion for a new trial was not made, and the trial judge was not given an opportunity to pass upon this feature of the case. If he had been asked to reduce the amount of the verdict, he might have done so. We have no substantial basis for changing it.

91 Mont. at 383, 8 P.2d at 643.

This Court has long adhered to the principle that "[t]he amount to be awarded as damages is properly left to the jury and this Court will not substitute its judgment for that of the jury . . ." Salvail v. Great Northern Railway Co. (1970), 156 Mont. 12, 31, 473 P.2d 549, 560. While the punitive damages in this case are large, they are within the discretion of the jury and were not raised as error in post-trial motions.

Judgment for the plaintiff is affirmed in all respects.

_____
Justice

17

We concur:

_J. A. Turnage_
Chief Justice

_John C. Sheehy_

_William E. Hunt_
Justices

18

Mr. Justice Fred J. Weber dissents as follows:

I dissent from that portion of Issue Six of the majority opinion which concludes that the punitive damages awarded in this case were not excessive. The jury returned the verdict for the plaintiff giving her economic damages of $94,170, emotional distress damages of $100,000 and punitive damages of $1,300,000. I conclude that under the factors hereafter described, the award of punitive damages in the amount of $1,300,000 was excessive.

Section 27-1-221, MCA, contains the statutory provisions with regard to punitive damages. Until the 1985 amendment which is not pertinent in this case, that statute provided for the award of punitive damages where the defendant has been guilty of oppression, fraud, or malice, actual or pre-sumed, and allowed the award of damages for the sake of example and by way of punishment. No additional factors were set forth. In 1927 this Court described what a jury should consider in setting the amount of a punitive damage award:

> "The jury should take into consideration the attendant circumstances, such as the malice or wantonness of the act, the injury intended, the motive for the act, the manner in which it was committed and the deterrent effect upon others . . . According to the general rule, it is proper for the jury to consider defendant's wealth and pecuniary ability in fixing the amount of damages." 17 C.J. 994, 995. . . . "The public good in the restraint of others from wrongdoing, as well as the punishment of the offender, is to be considered in estimating exemplary damages." Ward v. Ward, 41 Iowa, 686. Based on those determinative factors and general principles, in this state the rule is that the amount of exemplary damages must be reasonable. (Emphasis supplied).

Ramsbacher v. Hohman (1927), 80 Mont. 480, 489, 261 P. 273, 277.

19

In the case of Butcher v. Petranek (1979), 181 Mont. 358, 361, 593 P.2d 743, 744, this Court restated the rule in Montana that a jury award of punitive damages would not be disturbed unless the amount, considered in connection with the facts, indicates the jury was influenced by passion, prejudice, or corruption. My research indicates that there is a great difference of opinion in the various states on the manner and extent of review of punitive damages, both by the trial court and the appellate court. However, I do note that many courts have concluded that it was appropriate to set aside punitive damage awards on the basis of passion and prejudice, or similar rationales.

I approve the factors to be considered in reviewing punitive damages as set forth in Mallor and Roberts, Punitive Damages: Toward a Principled Approach, 31 Hastings L.J. 639 (1980). These factors are essentially as follows:

1. the severity of the harm likely to occur from defendant's conduct;

2. the degree of reprehensibility of defendant's conduct;

3. the profitability of the conduct;

4. the financial position of the defendant;

5. the amount of compensatory damages;

6. the costs of litigation;

7. potential criminal sanctions; and

8. other civil actions against the defendant based on the same conduct.

Because this is a dissent, I will not extensively analyze the facts as they apply to each of these factors. I do suggest that a clear contradiction is shown if we apply factor (5) to the present case. The amount of the compensatory damages totals $194,170. This factor alone raises a

20

significant question as to the punitive damages award of $1,300,000. As I seek to apply the above factors in my review of the facts of this case including the outrageous conduct on the part of the defendant, I conclude that an award of $1,300,000 as punitive damages is excessive.

This case tends to suggest the very real interplay which is possible on the jury's part with regard to the various categories of damages. We speak of economic damages and emotional distress damages as being compensatory in nature and different in character from punitive or exemplary damages. I'm not certain that the jury made that distinction. As an example, had the jury not been allowed to award punitive damages in excess of one million dollars as was done in this case, the facts would seem to warrant an award for emotional distress in excess of $100,000.

I would therefore reverse the judgment and remand for new trial so the plaintiff would have an adequate opportunity to recover all types of damages which she may prove.

_____
Justice

We concur in the foregoing dissent of Justice Weber.

_____
Justice

_____
Justice